ORIGINAL

NO. 08-21 C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
JAN 11 2008
U.S. COURT OF FEDERAL CLAIMS

SAVANTAGE FINANCIAL SERVICES, INC.,

Plaintiff,

v.

THE UNITED STATES.

Defendant.

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER

Timothy Sullivan
1909 K Street, N.W., 6th Floor
Washington, D.C. 20006
Phone: (202) 585-6930
Fax: (202) 585-6969

Attorney of Record for Plaintiff

Date: January 11, 2008

# TABLE OF CONTENTS


I. **Introduction** ..... 1

II. **Statement of the Questions Involved** ..... 2

III. **Factual Background** ..... 3

IV. **This Court Has Jurisdiction** ..... 10

V. **Plaintiff's Standing** ..... 11

VI. **Standards for Injunctive Relief** ..... 13

A. Likelihood of Success on the Merits ..... 14

1. The RFQ Violates 41 U.S.C. 253(a) By Implementing an Illegal Migration ..... 15

2. Violation of Various FAR Justification, Approval and Publication Requirements ..... 16

3. DHS' Choice of a Migration Candidate is Arbitrary, Capricious, An Abuse Of Discretion ..... 18

B. Irreparable Injury to Savantage ..... 20

C. Balance of Hardships ..... 21

D. Public Interest ..... 22

V. **Conclusion** ..... 23

# TABLE OF AUTHORITIES

## Cases

Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054 (Fed. Cir. 2000) ....................... 14

Advanced Systems Technology, Inc. v. United States, 69 Fed. Cl. 474 (2006) .......................... 22

Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294 (Fed. Cir. 2001) ..................... 11

Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87 (1983) .................. 14

Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345 (Fed. Cir. 2004) .......................... 10

Banknote Corp. of America, Inc., 56 Fed. Cl. 377 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004) .................. 11, 14

Beta Analytics Int'l., Inc. v. United States, 44 Fed. Cl. 131 (1999) .............................. 14

CCL Inc. v. United States, 39 Fed. Cl. 780 (1997) ....................................... 11, 12, 13

CIGNA Gov't Servs., LLC v. United States, 70 Fed. Cl. 100 (2006) ............................ 15

Cincom Sys., Inc. v. United States, 37 Fed. Cl. 266 (1997) ..................................... 22

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971), *abrogated on other grounds by* Califano v. Sanders, 430 U.S. 99 (1977) ....................... 14

CW Gov't Travel v. United States, 61 Fed. Cl. 559 (2004) ..................................... 12

Delbert Wheeler Constr., Inc. v. United States, 39 Fed. Cl. 239 (1997), *aff'd*, 155 F.3d 566 (Fed. Cir. 1998) .................. 13

FMC Corp. v. United States, 3 F.3d 424 (Fed. Cir. 1993) ........................................ 13

Gentex Corp. v. United States, 58 Fed. Cl. 634 (2003) ........................................ 21

Magellan Corp. v. United States, 27 Fed. Cl. 446 (1993) ................................... 20, 22

Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29 (1983) .................. 15

Northrop Grumman v. United States, 50 Fed. Cl. 443 (2001) ................................ 11, 12

OMV Med., Inc. v. United States, 219 F.3d 1337 (Fed. Cir. 2000) .............................. 15

Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728 (2000) .............................. 14, 20

PGBA, LLC v. United States, 57 Fed. Cl. 655 (2003) ....................13, 15, 20, 22

RAMCOR Services Group, Inc. v. United States, 185 F.3d 1286 (Fed. Cir. 1999)....................11

Rex Serv. Corp. v. United States, 448 F.3d 1305 (Fed. Cir. 2006) ....................11

Rotech Healthcare, Inc. v. United States, 71 Fed. Cl. 393 (2006)....................22

Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560 (2000)....................14, 20

## Statutes

Administrative Procedure Act, 5 U.S.C. § 706(2)(A)....................14

Administrative Dispute Resolution Act of 1996, 28 U.S.C. § 1491(b)(1)....................10, 11, 12

28 U.S.C. § 1491(b)(3) ....................21

28 U.S.C. § 1491(b)(4) ....................14

31 U.S.C. § 3551(2)....................11

41 U.S.C. 253(a) ....................15, 22

## Regulations

FAR 2.101....................10, 16

FAR 5.102(a)(6) ....................16

FAR 6.302-1(c)....................16

FAR 6.303-1 ....................17

FAR 6.304....................17

FAR 6.305 ....................17

FAR 7.102 ....................17

FAR 7.105 ....................17

FAR 8.405-6 ....................17

FAR 10.001(a)(1)....................17

FAR 10.001(c)(2)....................17

FAR 13.106-1(b) ........ 16

FAR 13.501 ........ 16

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **Savantage Financial Services, Inc.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No.________________** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiff Savantage Financial Services, Inc. ("Savantage") respectfully requests that this Court issue a temporary restraining order and preliminary and permanent injunctive relief prohibiting the Defendant from proceeding in any manner with the procurement identified as U.S. Department of Homeland Security (DHS) Request for Quotation (RFQ) No. HSHQDC-08-Q-00018, DHS Shared Baseline Solutions Architect Transformation and Systems Consolidation (TASC), or any related procurement, solicitation or task order, pending final resolution of Savantage's protest against the TASC RFQ. In support of its motion and application, Plaintiff states as follows:

### I. Introduction

Savantage protests the issuance of U.S. Department of Homeland Security (DHS) Request for Quotation (RFQ) HSHQDC-08-Q-00018, DHS Shared Baseline Solutions Architect Transformation and Systems Consolidation (TASC) and is seeking a temporary restraining order

and preliminary and permanent injunctive relief against DHS proceeding with the TASC RFQ or any related procurement action without complying with applicable statutory and regulatory requirements, including but not limited to conducting a competition in accordance with applicable law and regulations to select financial systems application software.

Savantage is a Maryland-based, woman owned-small business with approximately 150 employees, supporting the mission of federal government agencies through its software and support services, in the areas of Federal financial management, business and technology consulting services and solutions. Savantage's clients include the Department of Homeland Security, Department of Labor, Department of Treasury, Federal Retirement Thrift Investment Board, Department of Defense, Architect of the Capitol, US House of Representatives, and many others. Savantage has supported DHS and its INS predecessor through its financial system application software since 1997. (Pl. Ex. ("Pl. Ex.") No. 1, Declaration of Michael Handberg, ¶ 10.)

## II. Statement of the Questions Involved

A. Whether Plaintiff is entitled to injunctive relief because Plaintiff is likely to succeed in demonstrating that Defendant's conduct in issuing the RFQ is arbitrary and capricious, an abuse of discretion, and not in accordance with applicable law.

B. Whether Plaintiff is entitled to injunctive relief because the balance of harms weighs in Plaintiff's favor.

C. Whether Plaintiff is entitled to injunctive relief because the public interest favors the issuance of injunctive relief in Plaintiff's favor.

D. Whether Plaintiff is entitled to injunctive relief because Plaintiff will suffer irreparable harm if its request for injunctive relief is denied.

## III. Factual Background

Savantage won a full and open competition in 1997 to implement its Federal Financial Management System (FFMS) software for the U.S. Immigration and Naturalization Service (INS). Savantage's FFMS software is a complete enterprise, financial management solution used by Federal agencies to manage their financial enterprise. The software contains integrated, real-time modules, including Cost Management, Receipts Management, Funds Management, Payments Management, General Ledger Management and Reports Management. These are the functions a Federal agency needs to manage the financial and budgetary aspects of its business operations, so that users and managers have access to timely and accurate data for management purposes. (Pl. Ex. No. 1, ¶ 11.)

DHS was created in January 2003 from 22 separate agencies. See the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under 6 U.S.C. § 542. DHS began operations in March 2003, as mandated by the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002). INS was one of the agencies transferred to DHS. Within DHS, most of the former INS organization was established as two new and separate organizations - Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS). In March 2003, ICE was created by combining the law enforcement arms of the former INS and the former U.S. Customs Service. At the same time, the service and benefit functions of the INS transitioned into the DHS as the U.S. Citizenship and Immigration Services (USCIS). Savantage's FFMS, which was already the

financial system of record for the former INS, became the system of record for both ICE and USCIS, with ICE serving as the system owner.[1] (Pl. Ex. No. 1, ¶ 12.)

Savantage regularly maintains the FFMS software supporting DHS's ICE and its customer agencies. Since its implementation in 1997, Savantage has regularly delivered releases as well as updates to the software. These deliveries include both customer-specific enhancements to core software, as well as upgrades to keep current with technology advancements and changing government regulations and system requirements. (Pl. Ex. No. 1, ¶ 14.)

The Savantage FFMS software development lifecycle, from requirements through delivery to ICE, is audited each year by KPMG, the DHS outside auditors, as part of the Department's overall financial statement audit process. The audit steps performed are part of a Federal Information System Controls Audit Manual (FISCAM) audit. In 2005 and 2006, ICE was the agency with the lowest number of FISCAM audit findings within the entire Department by a wide margin, compared to other agencies with operational financial systems (such as Coast Guard and FEMA). Further, there have never been any FISCAM findings to date related to the software lifecycle process supporting FFMS upgrades to ICE. Pl. (Ex. No. 1, ¶ 15.)

DHS hired an independent consulting firm, SAIC, to evaluate all of the existing enterprise financial systems in place at DHS components and make recommendations as to which ones would be the best choices as long-term solutions to host other agencies upon

---

[1] In 2004, Savantage's FFMS solution was renamed Altimate for marketing reasons, i.e., to avoid confusion with competing products in the market place, some of which had similar names. However, it is the same solution referenced in the TASC RFQ as Federal Financial Management System (FFMS). For the purposes of this litigation, the Savantage Altimate solution will be referred to as Federal Financial Management System or FFMS following the usage in the RFQ. (Pl. Ex. No. 1, ¶ 13.)

migration to DHS to meet the department's complex and diverse financial and budgetary needs. All existing solutions were evaluated for a number of factors, such as compliance with Federal financial system requirements and mandates (as identified by OMB's FSIO/JFMIP organization), technological feasibility, and scalability. As a result of this detailed alternatives analysis and study, entitled "Homeland Security Financial Systems Analysis" and published in January 2003, the FFMS solution at the former INS and the Oracle solution at Coast Guard were identified as the only two enterprise financial systems in the Department which were already operational, met Federal financial management system requirements (*i.e.* as certified by OMB's FSIO/JFMIP), and had no significant or moderate deficiencies or limitations. This report, which evaluated the systems operational at the time at FEMA, the former INS (*i.e.* FFMS), TSA, Coast Guard, Customs Service and Secret Service in detail, identified the former INS' FFMS and the Coast Guard's Oracle solution as the only two systems within DHS that were capable and ready to host other agencies upon migration to DHS as of the date of the report. By late 2004, the deployment of FFMS was subsequently expanded so that new DHS organizations, such as the Science & Technology Directorate and others, also implemented the FFMS system to meet their financial and budgetary needs. (Pl. Ex. No. 1, ¶ 16.)

DHS began implementation of the Electronically Managing Enterprise Resources for Government Effectiveness and Efficiency (eMerge$^2$) program in January 2004 to integrate financial management systems across the entire department and to address the department's financial management weaknesses. The eMerge$^2$ project was expected to establish the strategic direction for migration, modernization, and integration of DHS financial, accounting, procurement, personnel, asset management, and travel systems, processes, and policies. GAO Report GAO-07-1041T at 3 (attached hereto as Pl. Ex. 2). The eMerge$^2$ project was not

successful and, in September 2006, eMerge² was officially "dead." DHS officials have stated that approximately $52 million was spent on the eMerge² project before it was halted in December 2005. DHS's decision to end the project before spending an estimated $229 million on a financial management system that would not provide the expected system functionality and desired performance was, in GAO's opinion, prudent. GAO supported DHS's decision to cut its losses. *Id.* at 4. In response to the demise of eMerge², to solve its perceived department-level concerns about the financial systems, DHS created the Transformation and Systems Consolidation (TASC) initiative.

The genesis of TASC and the explanation offered by DHS for its non-competitive selection of financial systems software are set out in the DHS Annual Financial Report 2007, Vol. 3, pp. 223-224: [2]

> In September 2006, the Department prudently ended its previous systems improvement effort, eMerge². The Department determined that rather than build a new system from scratch (the eMerge² strategy), it should leverage existing system investments with proven audit success. This effort, called the Transformation and Systems Consolidation (TASC) initiative, plans to consolidate financial systems by migrating Components to one of the two DHS Financial System Integration Office (FSIO) certified financial systems – Oracle Federal Financials and Systems Applications Products (SAP). TASC will consolidate over 97 percent of DHS to these two baselines by FY 2011. Following completion of the consolidation plan to two systems, a single Baseline will be chosen as the Department standard. The Department is committed to a single Baseline as the end state for its financial management needs.
>
> TASC is a joint effort between the Department's Office of the Chief Financial Officer and Office of the Chief Information Officer. OMB reviewed the TASC strategy in March, 2007 and the TASC expenditure plan was submitted to Congress in April, 2007. The Chief Financial Officer and Chief Information Officer testified before Congress regarding this initiative on June 28, 2007.

---

[2] Pages 223-225 of the DHS Annual Financial Report 2007 are attached as Pl. Ex. 3.

From this explanation it is clear that DHS decided to choose one of the five existing financial systems software applications in secret without engaging in any sort of competitive process. DHS is proceeding in this manner notwithstanding serious questions about the programmatic and technical logic for the decision. Savantage informally questioned this decision to effectively replace its FFMS solution with the less-capable Oracle solution. (*See* Pl. Ex. No. 4.) DHS refused to change its decision.

In its June 28th, 2007, testimony before the Subcommittee on Federal Financial Management, Government Information, Federal Services, and International Security, of the U.S. Senate Committee on Homeland Security and Governmental Affairs, the Government Accountability Office concluded that since September 2006, DHS had made little progress with its financial management systems transformation efforts, and had missed an invaluable opportunity to address existing financial management problems. GAO found that DHS had not developed an overall financial management transformation strategy that included financial management policies and procedures, standard business processes, a human capital strategy, and effective internal controls. GAO questioned DHS's choice of migration candidates:

> Our concern is that the components where the proposed shared baselines are currently in use have numerous financial management weaknesses and consequently do not appear to be good candidates to be the models for an entity with an annual budget in excess of $40 billion. For example, the financial statement auditors for TSA reported that TSA—which is serviced by the Coast Guard—was unable to provide sufficient evidential matter or make knowledgeable representations to support fiscal year 2005 and 2006 transactions and account balances, particularly for budgetary accounting and undelivered orders and property, plant, and equipment, among others.

(Pl. Ex. No. 2, at 6.) GAO found that TASC was not ready for prime time:

> In addition, the TASC strategy document and other draft documents DHS recently provided to us are incomplete. The documents provide a high-level perspective of the systems comprising the TSA shared baseline and broad time frames for migrating various DHS components. Much more

> detailed planning is needed to ensure that DHS has a solid foundation and road map for this transformation effort. For example, it is not clear which DHS component is expected to host the TSA shared baseline and what other services will be provided. Issues related to how this change will affect DHS's human capital are not yet addressed. Further, the TASC strategy does not address the CBP baseline nor, most importantly, how these various systems will ultimately be unified for department-wide information needs. Much more detail is needed to provide a financial management strategy or plan for integrating and modernizing DHS's financial management systems.

(Pl. Ex. No. 2, at 7.)

GAO concluded that it was "concerned that DHS still lacks a clearly defined financial management strategy or financial management system implementation effort to even begin to address the integration and transformation issues highlighted in our most recent high-risk report." *Id.*

Disregarding GAO concerns, on November 20, 2007, DHS issued RFQ No. HSHQDC-08-Q-00018 for "Transformation and Systems Consolidation (TASC)" as a Task Order Request under the DHS Enterprise Acquisition and Leading Edge Solutions (EAGLE) Contract, functional category Four (FC04) Software Development. The purpose of the RFQ is to support RMTO in pursuing the TASC initiative. Relevant pages of the RFQ are attached as Pl. Ex. No. 5. The scope of the RFQ is far from clear, but it does not include any sort of selection process for the financial systems application software.

The RFQ does not propose to acquire by competitive means new financial systems applications software, but to "migrate" software from one DHS agency to another. Five different financial systems applications software are presently in use within DHS: (1) Savantage's Federal Financial Management System (used by Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), National Protection and Programs Directorate (NPPD), Science & Technology Directorate (S&T), Office of Health Affairs (OHA)

and Office the Secretary & Under Secretary for Management (DHS HQ)); (2) Oracle's Federal Financials Core Accounting System (used by U.S. Coast Guard (USCG), Transportation Security Administration (TSA), Domestic Nuclear Detection Office (DNDO), and the U.S. Secret Service (USSS)); (3) SAP (used by U.S. Customs & Border Protection (CBP)); (4) Integrated Financial Management Information System (used by the Federal Emergency Management Administration (FEMA)); and (5) Momentum (used by the Federal Law Enforcement Training Center (FLETC)). The RFQ proposes to "migrate" the Oracle Federal Financials Core Accounting System to only six of these agencies, the six presently obtaining their financial systems applications software from Savantage (ICE, USCIS, NPPD, S&T, OHA and DHS HQ). The RFQ makes no pretense about how the Oracle Federal Financials software was selected:

> Rather than pursue the acquisition, configuration, and implementation of a new system, DHS will leverage two enterprise Shared Baselines:
>
> 1) *TASC Oracle Baseline,* an Oracle Federal Financials (OFF) system used by TSA and DNDO that integrate with Compusearch PRISM and Sunflower Assets
>
> 2) *TASC SAP Baseline*, an SAP-based integrated system used by CBP

(Pl. Ex. No. 5, at 10.) The RFQ states that the TASC Oracle Baseline was "selected by the Chief Procurement and Chief Administrative Officers." (Pl. Ex. No. 5, at 11.)

The statement implies that DHS already owns a paid-up, department-wide license for the Oracle Federal Financials software. This is not the case. DHS must pay a license fee for each individual user and to extend use of the software into another DHS component will require the payment of substantial additional license fees. (*See* Pl. Ex. No. 1, ¶ 4.) Information available to Plaintiffs supports a conclusion that the cost of software license fees alone for the Oracle Federal Financials Core Accounting System in the six of DHS agencies (ICE, USCIS, NPPD, S&T, OHA and DHS HQ) will exceed $25,000,000 in initial license fees and, with maintenance,

$75,000,000 over a ten-year period. Implementation costs are even higher. *Id.* This "migration" would clearly be a new procurement, and DHS does not appear to either be aware or concerned that this new procurement will take place in violation of statutory requirements for competition in government procurement. *See* FAR 2.101 (definition of "acquisition").

It is worth noting, that in late 2004 when the deployment of FFMS was subsequently expanded to new DHS organizations, such as the Science & Technology Directorate and others, this expanded use was possible because ICE had purchased an agency-wide license from Savantage and no additional cost was incurred by DHS to provide the software to the additional DHS components. (Pl. Ex. No. 1, ¶ 17.)

DHS, through TASC and the RFQ, is implementing a strategy that violates applicable statutory and regulatory requirements and is founded on decisions that are arbitrary, capricious, an abuse of discretion, and prejudicial to Savantage.

## IV. This Court Has Jurisdiction

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, §§ 12(a)-(b), 110 Stat. 3870 (Oct. 19, 1996), authorizes the U.S. Court of Federal Claims to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.") 28 U.S.C. § 1491(b)(1); *see also* Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).

The language of § 1491(b) does not require an objection to a specific solicitation or award, but only to the "violation of a statute or regulation in connection with a procurement or a proposed procurement." "The operative phrase 'in connection with' is very sweeping in scope.

As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction." RAMCOR Services Group, Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999).

In this case, Savantage alleges violation of the Competition in Contracting Act ("CICA") and various FAR provisions relating to sole source or brand name determinations "in connection with" the RFQ. The DHS actions which Savantages protests are "connected with" the RFQ because the RFQ embodies and documents the illegal DHS actions.

## V. **Plaintiff's Standing**

In order to maintain a bid protest action, a protestor must be an "interested party." 28 U.S.C. § 1491(b)(1). The Tucker Act, however, does not define the term "interested party." The U.S. Court of Appeals for the Federal Circuit has adopted the definition of "interested party" set forth in CICA. Northrop Grumman Corp. v. United States, 50 Fed. Cl. 443, 455-456 (2001) (*citing* Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1300-02 (Fed. Cir. 2001)). *See* Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); *see also* Banknote Corp., 365 F.3d at 1352 (holding that the United States Court of Federal Claims' jurisdiction under the Tucker Act, as amended, is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract"). CICA defines an "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Id.*; 31 U.S.C. § 3551(2).

The court relies on a two-part test to determine whether a party qualifies as an interested party. First, "plaintiff must stand in some connection to the procurement." CCL, Inc. v. United States, 39 Fed. Cl. 780, 790 (1997). Second, plaintiff "must have an economic interest" in the

procurement. *Id.* The court has held that "where a claim is made that the government violated CICA by refusing to engage in a competitive procurement, it is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals." *Id.*

The Court of Federal Claims in CCL Inc. v. United States, held that the ADRA (28 USC § 1491(b)) conferred jurisdiction to review a protest which challenged an agency's decision not to conduct a procurement to obtain certain services, but instead to obtain those services by modifying an existing contract. 39. Fed. Cl. at 789. The plaintiff in CCL was awarded an indefinite quantity/indefinite delivery contract to provide computer maintenance services at an Air Force facility in Denver for five years, including option years. Two years later, the Air Force decided not to renew CCL's contract. Instead, the Air Force issued a task order to a different firm, BDM, to obtain the services previously performed by CCL. CCL protested the decision to modify the BDM contract, arguing that the Air Force had violated CICA. Before granting injunctive relief for the protester, the court first held that it had jurisdiction to hear the case, despite the absence of a solicitation or the submission of proposals: "The new language permits both a suit challenging government action which is self-consciously a competitive procurement as well as what CCL is claiming here: that [the government] is procuring goods and services through a process that should have been the subject of competition; and that the failure to compete the procurement is in violation of law. The statute is therefore plainly invoked. " CCL, 39 Fed. Cl. at 789.

In a CICA case, failure to submit a proposal for the original contract is not fatal to standing. *See* CW Gov't Travel v. United States, 61 Fed. Cl. 559, 570 (2004); Northrop Grumman, 50 Fed. Cl. at 456 (2001); CCL, 39 Fed. Cl. at 790. In CW Gov't Travel, CCL, and

Northrop Grumman, the plaintiff had not bid on the original contract, yet the court found that the plaintiff had standing. The court in CCL explained that

> CCL did have a connection with the procurement. The work that it contends should have been competed was work that it wanted to do. Not only has CCL stated it would likely have submitted a proposal, but it was performing the very work that it alleges DISA illegally diverted to BDM. By not being able to compete, it potentially lost a contract. As the court held in *ATA Defense Industries v. United States*, 38 Fed. Cl. 489, 495 (1997), judicial review of procurement methods should not be thwarted through the wooden application of standing requirements. CCL has standing.

CCL, 39 Fed. Cl. at 790. Savantage has standing because it is Savantage's financial services application software that DHS has proposed to replace without any sort of competitive process. This demonstrates Savantage's connection with the procurement. Provision of this application software to the six DHS agencies constitutes half of Savantage's annual revenues. Savantage would submit a bid or offer for DHS financial services applications software if such a competition were held. (*See* Pl. Ex. No. 1, ¶ 7.)

## VI. Standards for Injunctive Relief

In order to obtain a preliminary injunction, plaintiff must demonstrate: (i) plaintiff's likelihood of success on the merits; (ii) irreparable injury to plaintiff if defendant is not enjoined; (iii) that the harm to plaintiff outweighs the harm to defendant; and (iv) that the public interest is served by enjoining defendant. FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); *see* Delbert Wheeler Constr., Inc. v. United States, 39 Fed. Cl. 239, 251 (1997), *aff'd*, 155 F.3d 566 (Fed. Cir. 1998). No one factor is dispositive to the court's inquiry as "the weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. v. United States, 3 F.3d at 427; *see also* PGBA, LLC v. United States, 57 Fed. Cl. 655, 656-57 (2003). Finally, because injunctive relief is relatively drastic in nature, a plaintiff must

demonstrate that its right to such relief is clear. *See* Banknote Corp. of America, Inc., 56 Fed.Cl. 377, 380-81 (2003), *aff'd*, 365 F.3d 1345 (Fed.Cir. 2004); Seattle Sec. Servs., Inc. v. United States., 45 Fed. Cl. 560, 566 (2000); *cf.* Beta Analytics Int'l., Inc. v. United States, 44 Fed. Cl. 131, 137 n.10 (1999).

A. Likelihood of Success on the Merits

Initially, the court must determine whether it is likely that it would overturn the decision to obtain the financial services application software without competition as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 28 U.S.C. § 1491(b)(4). Regarding the latter standard, which is drawn from the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the Supreme Court has stated:

> Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), *abrogated on other grounds by* Califano v. Sanders, 430 U.S. 99 (1977) (citations omitted); *see also* Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000); Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 731 (2000). By its very definition, this standard recognizes the possibility that there exists a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 105 (1983).

The Supreme Court amplified these requirements in Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29 (1983), identifying four grounds upon which a holding of arbitrary and capricious agency action could be based:

> [I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43; *see also* OMV Med., Inc. v. United States, 219 F.3d 1337, 1343 (Fed. Cir. 2000); CIGNA Gov't Servs., LLC v. United States, 70 Fed. Cl. 100, 110 (2006); PGBA, 57 Fed. Cl. at 657.

1. The RFQ Violates 41 U.S.C. 253(a) By Implementing an Illegal Migration

Section 253(a) of Title 41 of the U.S. Code requires that DHS "in conducting a procurement for property or services . . . shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this subchapter and the Federal Acquisition Regulation."

In the present case, DHS proposes to acquire additional licenses for a pre-selected proprietary financial systems software solution without conducting any sort of competition or otherwise justifying the absence of competition. DHS acknowledges that there are several different proprietary software solutions in use in various DHS agencies, including that belonging to Savantage. While the RFQ implies that only the solution arbitrarily selected by DHS can meet its requirements, this is demonstrably not the case. In fact, as shown by independent audits, the Savantage solution is superior to the solution surreptitiously selected by DHS.

Not only has DHS proceeded without benefit of any transparent or competitive process to select a proprietary financial systems software solution, but it has proposed to implement that

mysteriously selected solution only in the six DHS components presently serviced by the Savantage financial systems software solution, again without any opportunity for a head-to-head comparison of the two software solutions. This kind of arbitrary decision making without even a minimal acknowledgement of the requirements for "full and open competition through the use of competitive procedures" is precisely what is prohibited by the statute. Accordingly, DHS's actions are "not in accordance with law."

2. Violation of Various FAR Justification, Approval and Publication Requirements

According to the Federal Acquisition Regulation (FAR), "Acquisition begins at the point when agency needs are established and includes the description of requirements to satisfy agency needs." FAR 2.101.[3] DHS's designation of Oracle Federal Financials Core Accounting System as the chosen migration candidate for financial systems software application constitutes a significant stage of an acquisition. The DHS's surreptitious and *ad hoc* decision making without the formal steps required by the procurement process prevents simple identification of the regulatory violations. Nevertheless, the DHS actions appear to constitute the designation of a brand name product or sole source determination, and contract bundling.

By initiating an acquisition in this *ad hoc* manner, DHS has failed to comply with the various regulatory requirements for designating the use of a brand name product in disregard of advice in the Office of Federal Procurement Policy Memorandum of November 28, 2007 (copy attached as Pl. Ex. No. 6). These requirements include FAR 5.102(a)(6) ("When an acquisition contains brand name specifications, the contracting officer shall include with the solicitation the justification or documentation required by 6.302-1(c), 13.106-1(b), or 13.501"); FAR 6.302-1(c),

[3] FAR equates the terms "procurement" and "acquisition." FAR 2.101.

6.303-1, 6.304, and 6.305 (justification, certification, approval and publication requirements for sole source procurements including brand name determinations); FAR 7.102 (requirement for acquisition planning and market research); and FAR 7.105 (acquisition plan must address competition).

To the extent that the designation by DHS of the Oracle financial systems application software constitutes a sole source determination, DHS has not complied with the requirements of FAR 8.405-6 for justification, approval and publicizing of sole source determinations with respect to orders under FSS contracts. The DHS Annual Financial Report 2007 (Pl. Ex. No. 3) implies that a "thorough business and alternatives analysis" of the five financial systems application software systems in use was performed, but there is no evidence that the "Limited Source Justification" required by FAR 8.405-6(g) has been publicly released as required by the regulation. Also, there is no evidence that the justification approval required by FAR 8.405-6(h) has been obtained. DHS's attempt to obtain the Oracle financial systems application software on a sole-source basis violates the requirements of FAR 8.405-6.

Federal agencies are obligated to "[e]nsure that legitimate needs are identified and tradeoffs evaluated to acquire items that meet those needs." FAR 10.001(a)(1). DHS documents claim that tradeoffs between the various financial management systems software applications have been analyzed, but the content of that analysis and the justification for the decisions reached have not been disclosed. To the extent that the RFQ, by designating the Oracle Federal Financials Core Accounting System as GFI, has effectively created a bundled contract, DHS has failed to notify the affected incumbent small business concerns (which include Savantage) as required by FAR 10.001(c)(2).

As discussed above, there are many detailed requirements that must be addressed if an agency intends to procure a product on a sole-source or brand name basis. Although DHS has technically initiated a procurement to replace the Savantage Federal Financial Management System with the Oracle Federal Financials Core Accounting System, none of the FAR requirements identified above appear to have been addressed by DHS. Accordingly, DHS's actions are "not in accordance with law."

3. DHS's Choice of a Migration Candidate is Arbitrary, Capricious And An Abuse Of Discretion

Five different financial systems applications software solutions are presently in use within DHS. DHS, through a process lacking any transparency, determined to "migrate" all DHS components to a single existing system. In the DHS 2007 Annual Financial Report (Pl. Ex. No. 3), DHS claimed to have selected two of the five software applications, Oracle and SAP. However, in the RFQ issued in November 2007, DHS had apparently concluded to "migrate" only the Oracle software to the six DHS agencies presently serviced by the Savantage software.

The RFQ (Pl. Ex. No. 5), at page 9, claims that: "The current financial management systems at DHS are outdated, not cost effective and present significant obstacles to the Department's vision for the future of financial management." Neither the RFQ or other DHS documents provide the rationale for choosing the Oracle software as the migration candidate. The only hint as to what factors DHS may have considered are to be found in the seven DHS objectives that TASC allegedly meets as listed on pages 9 and 10 of the RFQ. Each of these objectives has already been met by the Savantage Federal Financial Management System presently implemented by ICE and five other DHS components. (*See* Attach. 3 to Pl. Ex. No. 1.)

The DHS Annual Financial Report 2007 claims, in support of its choice of migration candidates, that Oracle Federal Financials and Systems Applications Products (SAP) are the only two DHS Financial System Integration Office (FSIO) certified financial systems. (Pl. Ex. No. 3.) This is demonstrably false. The Financial Systems Integration Office (FSIO) within the General Services Administration, formerly known as the Joint Financial Management Improvement Program (JFMIP) staff office, has the responsibility for testing and certifying core financial systems software products. The FSIO website identifies seven products that are currently certified, including Savantage's Federal Financial Management System (under the newer marketing name, Altimate). (*See* Attach. 1 to Pl. Ex. No. 1 and http://www.fsio.gov/fsio/testing/kb_qualified_software_summary.shtml.)

The DHS Inspector General Independent Audit for 2007 found that the Coast Guard and TSA are not in full compliance with the Federal Financial Management Improvement Act. (Pl. Ex. No. 7, sec. IV-I.) The RFQ's Government Furnished Information List (Pl. Ex. No. 8) states that part of the Oracle Federal Financials Shared Baseline Financial Management System is the Core Accounting System which is to be acquired from the Coast Guard. The Core Accounting System is one of three general ledger systems used by the Coast Guard. The IG Audit states that the Core Accounting System general ledger system as implemented by the Coast Guard is "significantly noncompliant with the requirements of the Federal Financial Management Improvement Act (FFMIA)." (Pl. Ex. No. 7.)

DHS, without any disclosed analysis or rationale, has chosen to expand the use of a financial management system application software that has been criticized by two independent agencies, the DHS Inspector General and the GAO ("Our concern is that the components where the proposed shared baselines are currently in use have numerous financial management

weaknesses and consequently do not appear to be good candidates to be the models for an entity with an annual budget in excess of $40 billion."), that has been found to be non-compliant with federal statutes, and that will cost DHS significant additional funds.

The surreptitious DHS designation of the Oracle Federal Financials (OFF) system is arbitrary, capricious, and an abuse of discretion and should be enjoined.

B. Irreparable Injury to Savantage

When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993). This Court has acknowledged that a lost opportunity to compete may constitute an irreparable harm, especially where plaintiff is the incumbent and the selected "migration candidate" has not yet begun to implement its product in the agencies presently served by Savantage. PGBA LLC, 57 Fed. Cl. at 664 ("This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm . . . ."); Overstreet Elec. Co., 47 Fed. Cl. at 744; Seattle Sec. Servs., Inc., 45 Fed. Cl. at 571 (2000).

Plaintiff's contract with the DHS represents one-half of Plaintiff's annual revenues. Thus, the Court's failure to issue a preliminary injunction will result in a severe competitive disadvantage to Savantage by denying it the opportunity to continue to provide its financial systems application software solution to the six DHS agencies and to compete to provide future versions and upgrades of this software. What is at stake for Savantage is the opportunity to obtain an unknown amount of future business. If a competition were held to select a financial systems application software solution for any or all DHS components, Savantage would submit an offer. (Pl. Ex. No. 1, ¶ 7.) Loss of this opportunity is not compensable by money damages because there is no meaningful way to measure the value of such a loss.

C. Balance of Hardships

Under this factor, the court must consider whether the balance of hardships leans in the plaintiff's favor. This requires a consideration of the harm to the government. In considering a bid protest, the court is also required to "give due regard to the interests of national defense and national security . . . ." 28 U.S.C. § 1491(b)(3). It is not sufficient for DHS to simply make an assertion of an interest in national defense and national security. Such an assertion must be subject to the same analysis as other allegations. Gentex Corp. v. United States, 58 Fed. Cl. 634, 655 (2003) ("While the Court certainly must give serious consideration to national defense concerns and arguably should err on the side of caution when such vital interests are at stake, allegations involving national security must be evaluated with the same analytical rigor as other allegations of potential harm to parties or to the public.").

DHS has proposed "migrating" other financial systems applications software to exactly the six DHS agencies to which Savantage now provides functioning, certified financial systems applications software without giving Savantage any opportunity to compete to provide such software to DHS. Savantage, a small woman-owned business, could conceivably lose a very large part of its overall future business.

Weighing against the injury to Savantage, the six DHS agencies now have functioning and certified financial systems applications software in place, operating with fewer audit identified material weaknesses than the software that DHS proposes to use to replace the existing software. DHS has issued an RFQ with multiple deficiencies and has failed to respond to GAO recommendations that by all rights should be addressed before it proceeds with any procurement. DHS would lose little and actually gain much by canceling the RFQ and doing some thorough procurement planning, with attention to applicable legal requirements, before attempting to

procure services that are highly likely to repeat the failures of the past. A balancing of hardships weighs strongly in favor of Savantage.

D. Public Interest

The public interest will be served by granting the requested preliminary injunctive relief. "Clearly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." PGBA, 57 Fed. Cl. at 663; *see also* Rotech Healthcare, Inc. v. United States, 71 Fed. Cl. 393, 430 (2006); Cincom Sys., Inc. v. United States, 37 Fed. Cl. 266, 269 (1997); Magellan Corp., 27 Fed. Cl. at 448. "The public interest will be served by preserving the Court's ability to fashion relief should it ultimately determine an illegality occurred. There is an overriding public interest in preserving the integrity of the procurement process." Advanced Systems Technology, Inc. v. United States, 69 Fed. Cl. 474, 486 (2006); *see* Cincom Sys., Inc. v. United States, 37 Fed. Cl. 266, 269 (1997) (*citing* Magellan Corp., 27 Fed. Cl. at 448).

In the instant case, the public's interest likewise lies in preserving the integrity of the competitive process – such, indeed, clearly was Congress' view in providing that, except in circumstances not yet demonstrated here, DHS must comply with the requirements of 41 U.S.C. 253(a), "in conducting procurement for property or services" to "obtain full and open competition." On the evidence presently available, not "migrating" to the Oracle solution could save the taxpayers tens of millions of dollars – something that should be in the public interest. Granting injunctive relief will also preserve this Court's ability to fashion appropriate relief upon final determination that illegality has occurred. The integrity of the competitive process is challenged in this case in the most pernicious way, a surreptitious attempt to totally avoid the

constraints of CICA and the related provisions of the FAR. The public interest will be served by the issuance of injunctive relief.

## VI. Conclusion

Plaintiff respectfully requests this Court to issue a temporary restraining order and preliminary and permanent injunctive relief prohibiting the Defendant from proceeding in any manner with the procurement identified as U.S. Department of Homeland Security (DHS) Request for Quotation (RFQ) HSHQDC-08-Q-00018, DHS Shared Baseline Solutions Architect Transformation and Systems Consolidation (TASC), or any related procurement, solicitation or task order, pending final disposition of Plaintiff's Complaint in this matter.

Respectfully submitted,

Timothy Sullivan
1909 K Street, N.W., 6th Floor
Washington, D.C. 20006
(202) 585-6930 (tel.)
(202) 508-1028 (fax)

Attorney of Record for Plaintiff
Savantage Financial Services, Inc.

Of Counsel:

Katherine S. Nucci
Thompson Coburn LLP
1909 K Street, N.W., 6th Floor
Washington, D.C. 20006
(202) 585-6900 (tel.)
(202) 585-6969 (fax)

Dated: January 11, 2008