# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### Bid Protest

| | |
|---|---|
| Savantage Financial Services, Inc., ) | Agreed-to Public Version |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:08-cv-21 |
| ) | (Judge Futey) |
| THE UNITED STATES, ) | |
| ) | |
| Defendant. ) | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## ON THE ADMINISTRATIVE RECORD

Timothy Sullivan
1909 K Street, N.W., 6th Floor
Washington, D.C.  20006
(202) 585-6930 (tel.)
(202) 508-1028 (fax)

Attorney of Record for Plaintiff
Savantage Financial Services, Inc.

Of Counsel:

Katherine S. Nucci
Thompson Coburn LLP
1909 K Street, N.W., 6th Floor
Washington, D.C.  20006
(202) 585-6900 (tel.)
(202) 585-6969 (fax)

Dated:  February 8, 2008

4672800.1

## TABLE OF CONTENTS

I.      FACTUAL BACKGROUND .................................................................................. 2

II.     THE COURT HAS JURISDICTION TO DECIDE, AND
        PLAINTIFF HAS STANDING TO BRING, THIS CASE ................................. 7

III.    DEFENDANT'S PROCUREMENT ACTION VIOLATED
        STATUTORY AND REGULATORY REQUIREMENTS AND
        WAS ARBITRARY AND CAPRICIOUS .................................................... 12

        A.      Standard of Review .............................................................................. 12

        B.      DHS's Selection Of The Oracle And SAP Systems For
                Migration Throughout The Agency Constituted An
                Improper Sole-Source Procurement .................................................. 13

        C.      DHS Failed To Comply With Applicable Law With
                Respect To Its Brand Name Justification ......................................... 19

                1.      Statutory And Regulatory Requirements Regarding
                        Sole-Source Awards And Brand Name Justifications ........... 19

                2.      DHS's Brand Name Justification ....................................... 21

        D.      DHS's Justification Was Arbitrary And Capricious ....................... 24

IV.     CONCLUSION .................................................................................... 33

EXHIBIT A, Second Declaration of Michael Handberg

# TABLE OF AUTHORITIES

## CASES AND GAO DECISIONS

*Advanced Systems Technology, Inc. v. United States,*
  69 Fed.Cl. 474 (2006).......................................................................................7-8

*Aero Corporation v. Department of the Navy*, 540 F.Supp. 180
  (D.D.C. 1982) .............................................................................................16, 17

*Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294
  (Fed. Cir. 2001) .....................................................................................................9

*ATA Defense Industries, Inc. v. United States*, 38 Fed.Cl. 489 (1997) .......................................16

*Audio Intelligence Devices*, B-224159, Dec. 12, 1986, 86-2 CPD ¶ 670....................................18

*CCL Inc. v. United States*, 39 Fed. Cl. 780 (1997) ..........................................................8, 9, 10

*Chapman Law Firm v. United States*, 63 Fed. Cl. 25 (2004) ........................................................9

*CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559 (2004), aff'd,
  163 Fed.Appx. 853 (2005) ..................................................................................10

*Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071
  (Fed. Cir. 2001) ...................................................................................................11

*Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312
  (Fed. Cir. 2003) ...................................................................................................11

*KSD, Inc. v. United States*, 72 Fed.Cl. 236 (2006) ................................................................12

*Meyers Investigative & Security Servs., Inc. v. United States*, 275 F.3d
  1366 (Fed. Cir. 2002) ..........................................................................................10

*Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443 (2001).......................................10

*OTI America, Inc. v. United States*, 68 Fed. Cl. 108 (2005)...........................................8, 13, 14

*Public Warehousing Company K.S.C. v. Defense Supply Center
  Philadelphia*, 489 F.Supp.2d 30 (D.D.C. 2007) ......................................14, 15

*RAMCOR Services Group, Inc. v. United States*, 185 F.3d 1286
  (Fed. Cir. 1999) .....................................................................................................8

*Sturm, Ruger & Company, Inc.*, B-235938, Oct. 25, 1989, 89-2
  CPD ¶ 375.............................................................................................................18

## STATUTES AND REGULATIONS

10 U.S.C. § 2304(f)(4) ..................................................................................21

28 U.S.C. § 1491(b)(1) ..............................................................................*passim*

31 U.S.C. § 3551(2) ....................................................................................9

41 U.S.C. § 253(a)(1) ................................................................................19

41 U.S.C. § 253(c)(1) ..........................................................................15-16, 20

41 U.S.C. § 253(f)(3)(B) ........................................................................21-22

41 U.S.C. § 253(f)(3)(C) ............................................................................22

41 U.S.C. § 253(f)(3)(D) ............................................................................23

41 U.S.C. § 253(f)(3)(E) ............................................................................22

41 U.S.C. § 253(f)(4) ................................................................................21

41 U.S.C. § 403 ........................................................................................8

FAR, 48 C.F.R. § 2.101 ..............................................................................15

FAR, 48 C.F.R. § 5.102(a)(6) ..................................................................5, 23

FAR, 48 C.F.R. § 6.302-1 ..........................................................................20

FAR, 48 C.F.R. § 6.302-1(c) ......................................................................15

FAR, 48 C.F.R. § 6.303-1 ..........................................................................20

FAR, 48 C.F.R. § 6.303-2 ......................................................................21, 22

FAR, 48 C.F.R. § 6.303-2(a)(3) and (4) ......................................................21

FAR, 48 C.F.R. § 6.303-2(a)(5) ..................................................................22

FAR, 48 C.F.R. § 6.303-2(a)(6) ..................................................................22

FAR, 48 C.F.R. § 6.303-2(a)(7) ..................................................................22

FAR, 48 C.F.R. § 6.303-2(a)(8) ..................................................................23

FAR, 48 C.F.R. § 6.305 ......................................................................5, 20, 23

FAR 48 C.F.R. Subpart 6.3 .................................................................................................20

FAR, 48 C.F.R. § 10.002 ....................................................................................................23

FAR, 48 C.F.R. § 11.105 ....................................................................................................15

FAR, 48 C.F.R. § 11.105(a)................................................................................................21

FAR, 48 C.F.R. § 16.505(b)(1) ..........................................................................................21

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
**Bid Protest**

| | |
|---|---|
| Savantage Financial Services, Inc., ) <br><br> Plaintiff, ) <br><br> v. ) <br><br> THE UNITED STATES, ) <br><br> Defendant. ) | **Agreed-to Public Version** <br><br><br> **No. 1:08-cv-21** <br> **(Judge Futey)** |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON THE ADMINISTRATIVE RECORD

Plaintiff Savantage Financial Services, Inc. ("Savantage") hereby submits its motion for summary judgment on the Administrative Record ("AR"). As established below, Plaintiff is entitled to judgment in its favor on the grounds that the Department of Homeland Security ("DHS") violated both statute and regulation in connection with Solicitation No. HSHQDC-08-Q-00018 ("TASC solicitation") when it failed to conduct a competitive procurement for purposes of selecting the financial management software system(s) to be used by all DHS components as a result of DHS's consolidation initiative.

Rather than conduct a competitive procurement for a single financial management software application as has been done in recent years by the U.S. Army, U.S. Air Force, U.S. Department of Labor, U.S. Department of Agriculture, and U.S. Department of Justice,[1] DHS secretly chose systems currently provided by Oracle Corporation ("Oracle") and SAP AG ("SAP") to replace Savantage's system now used by six components of DHS via the TASC

---

[1] *See* Exhibit A hereto, Second Declaration of Michael Handberg, ¶ 13, attached hereto ("Second Handberg Declaration").

solicitation for support services to implement DHS's consolidation initiative. The TASC solicitation incorporated DHS's secret decision, memorialized in an unpublished brand name justification dated July 27, 2007 ("Justification"), to select the Oracle and SAP systems as the shared baseline systems throughout the agency. Although Savantage has successfully provided its financial management software system to six DHS components for nearly a decade, DHS's actions effectively shut out any opportunity for Savantage, through a proper competitive procurement, to demonstrate that its system will best meet DHS's need for an agency-wide financial management software system. Plaintiff therefore seeks a ruling from this Court that Defendant's actions were arbitrary and capricious, an abuse of discretion, and contrary to applicable law.

## I.   FACTUAL BACKGROUND

The DHS was created in January 2003 from 22 separate agencies. AR, p. 103. Five different financial systems application software solutions are currently in use among the DHS's 22 components:

> a.   Savantage's Federal Financial Management System ("FFMS") (used by Immigration and Customs Enforcement ("ICE"), U.S. Citizenship and Immigrations Services ("USCIS"), National Protection and Programs Directorate ("NPPD"), Science & Technology Directorate ("S&T"), Office of Health Affairs("OHA") and Office of the Secretary & Under Secretary for Management ("DHS HQ"));
>
> b.   Oracle Corporation's Federal Financials Core Accounting System (used by U.S. Coast Guard ("USCG" or "Coast Guard"), Transportation Security Administration ("TSA"), U.S. Secret Service ("USSS" or "Secret Service") and the Domestic Nuclear Detection Office ("DNDO"));
>
> c.   Systems Applications Products ("SAP") software used by Customs & Border Protection ("CBP");
>
> d.   Integrated Financial Management Information System used by the Federal Emergency Management Administration ("FEMA"); and
>
> e.   Momentum used by the Federal Law Enforcement Training Center ("FLETC").

AR, 104-105.

In 2003, DHS began implementation of the Electronically Managing Enterprise Resources for Government Effectiveness and Efficiency ("eMerge²") program by awarding a contract to integrate financial management systems across the entire department and to address the department's financial management weaknesses. AR, p. 774. The DHS decided to abandon the eMerge² project because of the contractor's failure to build a usable system that provided value beyond what was already in place at the DHS. AR, p. 783. After the failure of the eMerge² project, the DHS determined that rather than build a new system from scratch (the eMerge² strategy), it would "leverage" existing financial system application software. This effort, called the Transformation and Systems Consolidation ("TASC") initiative, proposed to consolidate financial systems application software by "migrating" DHS components to a shared baseline using the Oracle or SAP systems. AR, p. 775. In testimony before the U.S. Senate on June 28, 2007, DHS's Chief Financial Officer and Chief Information Officer stated that "rather than pursue the acquisition, configuration, and implementation of a new system within DHS, we will leverage our existing investments by continuing the migration of Components to these two proven financial management systems." AR, p. 775.

On July 26, 2007, a DHS contracting officer, ⬛⬛⬛⬛⬛⬛⬛, signed a "Brand Name Justification" document determining that the Oracle and SAP financial management systems provided the DHS "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛." The document concluded by stating, "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛." ⬛⬛⬛⬛⬛⬛



determination was accompanied by the certification of ⬛⬛⬛⬛⬛⬛, the Director of the agency's Resource Management Transformation Office ("RMTO"). The head of the DHS

contracting activity did not sign the document, but there is an indication that her signature was "not required." AR, pp. 746-47.

The Justification was accompanied by a package of information called "Enterprise Architecture Board Technology Insertion Supporting Documentation." AR, p. 748. This package included a document entitled "OCIO/OCFO Business Case for Transformation and Systems Consolidation," AR, pp. 749-772 ("Business Case"), and a document entitled "Analysis of Alternatives For Transformation and Systems Consolidation (TASC)." AR, pp. 780-87 ("Alternatives Analysis"). While these documents contain a significant amount of analysis relating to the agency's alternatives, none of that information was derived through the competitive process required by the Competition in Contracting Act ("CICA") and the Federal Acquisition Regulation ("FAR"). *Id.*

The Business Case contained the following explanation for selecting the Oracle and SAP systems:



The agency then noted that Oracle and SAP "███████████████████████████ ███████████████" and listed ██ agencies that use Oracle and ██ that use SAP. AR, pp.

754-55. The DHS did not make the Justification and its supporting documentation available for public inspection as required by FAR 6.305.

Having determined that the DHS would migrate to Oracle and SAP without having conducted a competitive procurement to support that determination, the agency then issued the Solicitation No. HSHQDC-07-Q-00294 on August 22, 2007. The solicitation was designed to select a company among Functional Category 4 contractors under DHS's Enterprise Acquisition Gateway for Leading-Edge Solutions ("EAGLE") contracts to manage the migration process to the Oracle and SAP systems, but no offeror submitted a proposal by the September 7, 2007 deadline. The DHS then began a series of information-sharing activities with industry, and, based on those activities, decided to cancel the solicitation on October 4, 2007. AR, p. 802.

On November 20, 2007, DHS issued the TASC solicitation as a Task Order Request under the EAGLE contract, functional category Four (FC04) Software Development. The purpose of the solicitation is to support RMTO in pursuing the TASC initiative to consolidate DHS's financial management software systems to the Oracle and SAP systems. AR, Tab 4. The solicitation proposes to "migrate" six DHS components that are currently using Savantage's FFMS system (ICE, USCIS, NPPD, S&T, OHA and DHS HQ), to the Oracle system. AR, p. 78. Amendment 0003 to the solicitation provided that Technical and Price Quotations were due not later than 2:00 p.m. on January 15, 2008. AR, Tab 8. Neither the solicitation nor any amendment thereto included the Justification and supporting documents as required by FAR 5.102(a)(6).

Savantage's FFMS is a Financial System Integration Office (FSIO)-certified financial system and meets all of the performance objectives for a financial systems application software

solution stated in the solicitation. It is an Oracle-based commercial off-the-shelf ("COTS")

software system that contains integrated, real-time modules, including Cost management,

Receipts Management, Funds Management, Payments Management, General Ledger

Management and Reports Management, which are functions that a Federal agency needs to

manage the financial and budgetary aspects of its business operations. Savantage has regularly

maintained and upgraded the FFMS software, including both customer-specific enhancements

to core software and upgrades to remain current with technology advancements and changing

government regulations and system requirements. In addition to DHS, Savantage customers

include the Department of Labor, Department of Treasury, Department of Defense, Architect

of the Capitol, Federal Retirement Thrift Investment Board, U.S. House of Representatives,

and many others. The DHS owns a paid-up, department-wide license for Savantage's FFMS.

Savantage's support of the application software used by the six DHS agencies constitutes one-

half of Savantage's annual revenues. Exhibit 1 to Plaintiff's Appendix in Support of its Motion

for Preliminary Injunction and Application for Temporary Restraining Order ("Plaintiff's

Appendix").

No competition of any kind was conducted for the selection of the financial

management software system for implementation of DHS's consolidation initiative. Instead,

the DHS based its selection decision on the Justification package described above. AR, pp. 746-

91. On information and belief, the cost of software license fees alone for the Oracle system to

be migrated to the six DHS components (ICE, USCIS, NPPD, S&T, OHA and DHS HQ) will

exceed $25,000,000 in initial license fees and $75,000,000 over a ten-year period.

Implementation costs are even higher. Exhibit 1, ¶ 6, to Plaintiff's Appendix. The costs for

additional Oracle systems, expanded licensing of the Oracle system, and/or expanded

maintenance of the Oracle system were not discussed in the DHS's Business Case; however,

Savantage estimates that the proposed TASC migration will increase DHS's costs by over $159 million over the next ten years.  Second Handberg Declaration, ¶ 9, and Attachment 1 thereto.

The DHS components supported by the Oracle Federal Financials Core Accounting System, the Coast Guard , TSA and the Secret Service, were cited in the DHS Office of the Inspector General Independent Auditor's Report on DHS's FY2007 Financial Statements as having material deficiencies related to the financial systems application software.  The components supported by Savantage's FFMS did not have such material deficiencies.  Exhibit 1, ¶ 16, and Exhibit 7 to Plaintiff's Appendix.

## II.    THE COURT HAS JURISDICTION TO DECIDE, AND PLAINTIFF HAS STANDING TO BRING, THIS CASE

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, §§ 12(a), (b), 110 Stat. 3870 (Jan. 3, 1996), gives the Court jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

> The statute's use of the conjunction "or" makes it clear that the Court has jurisdiction over each of the three identified types of actions:
>
> > 1) an action objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award of a contract, *i.e.*, a pre-award protest, or
> >
> > 2) an action objecting to the award of a contract, *i.e.*, a post-award protest, or
> >
> > 3) an action objecting to any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

*Advanced Systems Technology, Inc. v. United States*, 69 Fed.Cl. 474, 482 (2006). The language of § 1491(b) does not require an objection to the actual contract procurement, but only to the "violation of a statute or regulation in connection with a procurement or a proposed procurement." The operative phrase "in connection with" is "very sweeping in scope. As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction." *RAMCOR Services Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999).

Congress defined the term "procurement" to include "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." 41 U.S.C. § 403. "Furthermore, when Congress enacted the ADRA in 1996, adding subsection (b) to the Tucker Act, its goal was to grant this court jurisdiction 'over the full range of procurement protest cases.' H.R. CONF. REP. 104-841, at 10 (1996)." *OTI America, Inc. v. United States*, 68 Fed. Cl. 108, 114 (2005).

The Court of Federal Claims in *CCL Inc. v. United States*, 39 Fed. Cl. 780 (1997), held that it had jurisdiction to review a protest which challenged an agency's decision not to conduct a procurement to obtain certain services, but instead to obtain those services by modifying an existing contract. The protester in *CCL* was awarded an indefinite quantity/indefinite delivery contract to provide computer maintenance services at an Air Force facility in Denver for five years, including option years. Two years after award, the Air Force decided not to renew CCL's contract. Instead, the Air Force issued a task order under a contract with a different firm, BDM, to obtain the services previously performed by CCL. CCL protested the decision to modify the BDM contract, arguing that the Air Force had violated CICA. Before granting injunctive relief for the protester, the court first held that it had jurisdiction to hear the case,

despite the absence of a solicitation or the submission of proposals: "The new language [from 1491(b)] permits both a suit challenging government action which is self-consciously a competitive procurement as well as what CCL is claiming here: that [the government] is *procuring* goods and services through a process that should have been the subject of competition; and that the failure to compete the procurement is *in violation of law.* The statute is therefore plainly invoked." *Id.* at 789 (emphasis in original). *Accord, Chapman Law Firm v. United States*, 63 Fed. Cl. 25, 33 (2004) (recognizing that this court has jurisdiction over a protest premised on an alleged violation of statute or regulation by the SBA "in connection with a procurement").

In this case, Savantage alleges violation of CICA and various FAR provisions relating to sole-source or brand name determinations "in connection with" the TASC solicitation. The DHS actions that are being protested by Savantage are "connected with" the TASC solicitation because the solicitation embodies and documents the illegal DHS decision to select the Oracle and SAP systems without the benefit of competition. Accordingly, the Court has jurisdiction in this matter.

In addition, Plaintiff has standing to bring this action. The Tucker Act creates jurisdiction in the Court over bid protest actions brought by an "interested party." 28 U.S.C. § 1491(b)(1). The Tucker Act, however, does not define the term "interested party." The United States Court of Appeals for the Federal Circuit has adopted CICA's definition of "interested party," namely, "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1300-02 (Fed. Cir. 2001)(*citing* 31 U.S.C. § 3551(2). The CICA definition establishes a two-part test to determine whether a party qualifies as an interested party. First, the plaintiff must be "an actual or prospective bidder or

offeror." In addition, the plaintiff must show that a "direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2).

In a situation where a solicitation or award is not being challenged, but the protest concerns a "violation of statute or regulation in connection with a procurement", standing will be determined "based on whether the protesting contractor could compete for the new contract work and whether it has an economic interest in such work, unhindered by the restrictions applicable when a bidder protests a solicitation that has already taken place." *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 456 (2001). It is sufficient that plaintiff stands "in some connection to the procurement." *CCL supra,*, 39 Fed. Cl. at 790. The Court has held that "where a claim is made that the government violated CICA by refusing to engage in a competitive procurement, it is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals." *Id.; see also CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 570 (2004), *aff'd*, 163 Fed.Appx. 853 (2005); *Northrop Grumman, supra*, 50 Fed. Cl. at 456. In *CW Gov't Travel, CCL*, and *Northrop Grumman*, the protestor had not bid on the original contract, yet the court found that the protestor had standing in each case. The court in *CCL* explained the rationale as follow:

> CCL did have a connection with the procurement. The work that it contends should have been competed was work that it wanted to do. Not only has CCL stated it would likely have submitted a proposal, but it was performing the very work that it alleges DISA illegally diverted to BDM. By not being able to compete, it potentially lost a contract. As the court held in *ATA Defense Industries v. United States*, 38 Fed. Cl. 489, 495 (1997), judicial review of procurement methods should not be thwarted through the wooden application of standing requirements. CCL has standing.

39 Fed.Cl. at 790.

In addition to being an actual or prospective bidder, to have standing a plaintiff must show prejudice. *Meyers Investigative & Security Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (Prejudice (or injury) is a necessary element of standing). In *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071 (Fed. Cir. 2001), the Court held:

> When a party contends that the procurement procedure in a sole-source case involved a violation of a statute, regulation, or procedure, it must establish prejudice by showing that it would have had a substantial chance of receiving the award, *see Statistica*, 102 F.3d at 1582. A disappointed party can establish prejudice either by showing: (1) proceeding without the violation would have made the procurement official's decision to make a sole-source award rather than to conduct a competitive bidding process irrational, *see* 5 U.S.C. § 706; *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 281 (1974), and in a competitive bidding process, the complaining party would have a substantial chance of receiving the award, *see Alfa-Laval*, 175 F.3d at 1367; or (2) proceeding without the violation, the complaining party would have a substantial chance of receiving the sole-source award, *see id.*

*Id.* at 1086. The Federal Circuit has held that a protester need not show that "but for the alleged error, the protester would have been awarded the contract;" rather, it must be demonstrated that "the protester's chance of securing award must not have been insubstantial." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003). In cases where, as here, the protester is not an actual disappointed bidder, the necessary showing of prejudice was explained as follows:

> In *Impresa* [*Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001),] we considered the standard to be applied where the plaintiff claims that the government was obligated to rebid the contract (as contrasted with a situation in which the plaintiff claims that it should have received the award in the original bid process). (citations omitted). To have standing, the plaintiff need only establish that it 'could compete for the contract' if the bid process were made competitive. . . . [Plaintiff] *need not* show that it would have received the award in competition with other hypothetical bidders, [but rather] must show that it would have been a qualified bidder.

*Myers, supra*, 275 F.3d at 1370 (emphasis added).

Savantage has standing because it is Savantage's financial management software system that DHS plans to replace without any sort of competitive process. This demonstrates Savantage's connection with the procurement at hand because the TASC solicitation requires the winning support services contractor to replace Savantage's FFMS system at the six DHS components with the Oracle system. Savantage is significantly prejudiced by DHS's actions because provision of its FFMS to the six DHS components constitutes a significant part of Savantage's current business. Moreover, Savantage would submit a bid or offer for DHS financial services applications software if such a competition were held. *See* Exhibit 1, ¶¶ 7 and 18, to Plaintiff's Appendix. Finally, Savantage is a responsible contractor that is fully capable of meeting all of DHS's needs in connection with the TASC initiative, and it would have a substantial chance of receiving an award based on a competitive procurement for the financial management software system. Indeed, Savantage's FFMS system has been selected for award by other Federal agencies in procurements where Oracle was a disappointed offeror. *See* Second Handberg Declaration, ¶ 14.

## III.   DEFENDANT'S PROCUREMENT ACTION VIOLATED STATUTORY AND REGULATORY REQUIREMENTS AND WAS ARBITRARY AND CAPRICIOUS

### A.   Standard of Review

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, this Court reviews bid protest actions under the Administrative Procedure Act ("APA") standards. *See* 28 U.S.C. § 1491(b)(1)-(4) (2000). As explained by the Court:

> Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D) (2000); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). . . .

*KSD, Inc. v. United States*, 72 Fed.Cl. 236, 250 (2006). Moreover, as stated in the preceding

section, a protester must establish prejudice as a result of the government's actions. *Id.* at 254.

The identical review standards apply under the APA in the context of sole-source awards. *Id.* at

255.

      As evidenced by the AR and the parties' submissions, there can be no question that

DHS's selection of the Oracle and SAP financial management software systems for migration

to other DHS components, without competition and to the exclusion of the Savantage system,

was arbitrary and capricious, was not in accordance with law, and was not in accordance with

procedures required by law. Savantage is clearly prejudiced by DHS's improper actions because,

as the provider of a superior – or at a minimum comparable – financial management software

system to six DHS components and to numerous other federal agencies, Savantage would have

had a substantial chance that its system would have been selected for migration to other DHS

components as a result of a competitive procurement.

    B.    DHS's Selection Of The Oracle And SAP Systems For Migration
           Throughout The Agency Constituted An Improper Sole-Source Procurement

      When DHS determined that it was in the agency's best interests to reduce the number

of financial management software systems used by DHS's many components, which

determination culminated in the selection of the Oracle and SAP systems, DHS was

conducting a procurement without the benefit of competition. In connection with

jurisdictional challenges under § 1491(b)(1) of the Tucker Act, this Court and others have

addressed the meaning of the statutory language "any alleged violation of statute or regulation

in connection with a procurement or a proposed procurement" for purposes of deciding

whether the action at issue constituted a "procurement" or "proposed procurement." In *OTI*

*America, Inc. v. United States*, 68 Fed.Cl. 108 (2005), the protester challenged a decision of the

Government Printing Office to cease further orders of samples or product from the contractor

(*i.e.*, the "deselection" of OTI America to participate in the next stages in the development of

electronic passport covers), and the Government argued that the Court lacked subject matter

jurisdiction because the "deselection" decision did not constitute a procurement. The Court's

disagreement with the Government's position was prefaced with the following:

> The third, concluding prong of paragraph (1) has been given a
> broad interpretation. *See RAMCOR*, 185 F.3d at 1289 ("The
> operative phrase 'in connection with' [a procurement or a
> proposed procurement] is very sweeping in scope.") Moreover,
> Congress has defined the term "procurement" to include "all
> stages of the process of acquiring property or services, beginning
> with the process for determining a need for property or services
> and ending with contract completion and closeout." 41 U.S.C. §
> 403. Furthermore, when Congress enacted the ADRA in 1996,
> adding subsection (b) to the Tucker Act, its goal was to grant this
> court jurisdiction "over the full range of procurement protest
> cases." H.R. CONF. REPP. [sic] 104-841, at 10 (1996).

*Id.* at 114. DHS's Justification clearly falls within Congress's definition of the term

"procurement" inasmuch as it reflects the agency's determination of a need to consolidate its

financial management software systems and a decision to select the Oracle and SAP systems to

fulfill that need, to the exclusion of Savantage's FFMS system. Indeed, DHS's decision to

proceed with the existing systems provided by Oracle and SAP, rather than with Savantage's

existing system, is comparable to the "deselection" decision in *OTI America* that this Court

determined was a procurement.

   In a recent decision of the U.S. District Court for the District of Columbia, the Court

dismissed an action by a government contractor claiming that the Defense Supply Center had

wrongfully refused to disclose to other government agencies its reviews of the contractor's

performance under existing contracts on the grounds that jurisdiction for such an action was

vested in the Court of Federal Claims by the Tucker Act, as amended by the Administrative

Dispute Resolution Act. *Public Warehousing Company K.S.C. v. Defense Supply Center

Philadelphia*, 489 F.Supp.2d 30 (D.D.C. 2007). The Court determined that the requirement in

the FAR for agencies to provide contractors with performance evaluations is encompassed by

contract "closeout" and "fits comfortably within the body of regulations that are 'in connection

with a procurement or a proposed procurement'", *id.* at 39, based upon its interpretation of the

term "procurement" in the statute:

> Much depends, however, on the meaning of the term
> "procurement" – a term not defined in the ADRA.  The Court of
> Federal Claims has construed "procurement" as used in section
> 1491(b)(1) to encompass "all stages of the process of acquiring
> property or services, beginning with the process for determining a
> need for property or services and ending with contract completion
> and closeout," borrowing from Congress's definition of the term
> procurement at 41 U.S.C. § 403(2).  *OTI America*, 68 Fed.Cl. at
> 114; *Labat-Anderson, Inc. v. United States*, 50 Fed.Cl. 99, 104
> (Fed.Cl. 2001); *accord Labat-Anderson*, 346 F.Supp.2d at 151
> (applying this definition in construing section 1491(b)(1)).  Thus,
> a "statute or regulation in connection with a procurement or a
> proposed procurement" includes, by definition, a regulation in
> connection with any stage of the federal contracting acquisition
> process, including "contract completion and closeout."

*Id.* at 38-39.  The same rationale applies to brand name justifications, which are governed by

regulation (FAR 6.302-1(c) and 11.105), that occur during the planning stage of an acquisition.[2]

Thus, DHS's decision, via the Justification, to acquire financial management software

systems for use agency-wide through the continuation and expansion of its contracts with

Oracle and SAP, which will result in the termination or discontinuance of DHS's contractual

relationship with Savantage for its system, clearly constitutes a procurement.  It is Savantage's

---

[2]  The definition section of the FAR, 2.101, includes the term "procurement" by referring to the defined
term "acquisition," which is as follows: "Acquisition means the acquiring by contract with appropriated
funds of supplies or services (including construction) by and for the use of the Federal Government
through purchase or lease, whether the supplies or services are already in existence or must be created,
developed, demonstrated, and evaluated.  Acquisition begins at the point when agency needs are
established and includes the description of requirements to satisfy agency needs, solicitation and
selection of sources, award of contracts, contract financing, contract performance, contract
administration, and those technical and management functions directly related to the process of
fulfilling agency needs by contract."  As a result of its selection decision, DHS has acquired, or will
acquire, with appropriated funds expanded licensing to use the Oracle system within the six DHS
components designated for the migration effort at a substantial cost to the Government.  Exhibit 1, ¶¶ 4-
6, to Plaintiff's Appendix.  Clearly, DHS's selection decision falls within this definition as well.

contention that the DHS Justification is tantamount to an improper sole-source procurement that must be enjoined by the Court.  Because a brand name justification is encompassed within the FAR section (6.302-1(c)) implementing the "only one responsible source" exception to the Competition in Contracting Act's requirements for full and open competition, 41 U.S.C. § 253(c)(1), Savantage assumes that is the competition exception invoked by DHS even though the Justification, as discussed below, failed to cite its statutory authority.

In *ATA Defense Industries, Inc. v. United States*, 38 Fed.Cl. 489 (1997), this Court held that a sole-source justification under the "only one responsible source" exception was legally flawed because the products and services included in the challenged purchase order were readily available from the protester and other sources on the open market.  *Id.* at 501-502.  Regarding the particular competition exception, the Court made the following observations:

> Where in fact "the property or services needed . . . are available from only one responsible source," and the selling party knows that it is the only source, then this exception is hardly a significant departure from full and open competition.  In such a case, if the agency used competitive procedures and solicited offers or bids from other sources, that act would be futile because the supplier would be aware, in setting its price, that it was not bidding against any competition.  As to the use of sole source procurement where there is more than one but only a limited number of responsible sources, FAR 6.301 still requires that "the contracting officer . . . solicit offers from as many potential sources as is practicable under the circumstances."

*Id.* at 500.  Here, assuming the reasonableness of DHS's desire and/or need to migrate its components to a system already in use at the agency rather than purchasing an entirely new system, there are several responsible sources, including Savantage, Oracle and SAP, with compliant systems in use at DHS from which offers can be solicited.  DHS's Justification, and thus its sole-source procurement of the Oracle system[3], is not legally justified.

---

[3] Although the Justification authorizes a shared baseline using both the Oracle and SAP systems, in fact the TASC solicitation only provides for the migration of the Oracle system to the DHS components that

It is not sufficient that the Oracle system may be superior in DHS's view or that it is the preferred system.  In *Aero Corporation v. Department of the Navy*, 540 F.Supp. 180 (D.D.C. 1982), the District Court rejected a sole-source justification even where there was no doubt about the selected contractor's technical and administrative superiority to overhaul C-130 airplanes because there were other responsible sources, including the protester, that could provide the services.  The Court held that "the technical and administrative superiority of a given firm over all other possible sources has never been accepted as a justification for sole-source procurement from that firm."  *Id.* at 208.  Moreover, even recognizing the discretion and flexibility allowed procurement officers to define their own needs, the Court stated that that flexibility "has never been extended to approval of sole-source procurement where the facts show the company selected was not the only one competent to perform the contract," and concluded:

> Implicit in that firm principle is an assumption that a procurement officer has not discharged his obligation to pursue competition if, before competition could have been begun, he peremptorily selects the "best" company.  If there is more than one merely competent firm, then a hard look at the competition may substantially improve the result obtained by the government. (citations omitted).

*Id.*  The following observation by the Court is particularly apt here:

> This case illustrates well the legitimacy of the Comptroller-General's distinction between findings that a sole-source awardee was superior and that such an awardee was solely qualified to do the work.  The particular technical advantages of LGC are important, and should play a critical role in evaluation of proposals.  The Acting Comptroller-General's opinions in this case recognized that point.  All his rule would have required in

---

are currently using the Savantage system.  The SAP system is only used by Customs & Border Protection, and DHS ultimately plans to consolidate to a single Baseline.  AR, Tab 13, p. 800.  By the time the migration services being procured through the TASC solicitation are completed, ██% of the DHS components will be using the Oracle system (AR, Tab 13, p. 756, Figure 1.1), so it is highly probable DHS intends that the single Baseline will be the Oracle system.

> this case would have been solicitation of proposals, followed by
> fair consideration of those received.  As the Acting Comptroller-
> General noted, "(t)he place where . . . differences (in technical
> merit) appropriately should be considered is in evaluating
> proposals in connection with a negotiated procurement."

*Id.* at 208-209.  The Court has described all that Savantage is seeking here, namely, a

competitive procurement and the opportunity to have its proposal to provide the shared

baseline financial management software system given fair consideration by DHS.  Indeed, as

noted by the Court, competition may substantially improve the result, from both a technical

and cost standpoint, for DHS.

In connection with the Drug Enforcement Agency's "standardization program" to limit

the number of approved manufacturers of 9mm semi-automatic pistols, the GAO rejected the

agency's "brand name" documentation as a proper sole-source justification and sustained the

protester's challenge to its exclusion from a competition for such pistols.  *Sturm, Ruger &*

*Company, Inc.*, B-235938, Oct. 25, 1989, 89-2 CPD ¶ 375.  Like the situation here, the

protester was never given the opportunity to demonstrate to the agency that its pistols satisfied

the agency's minimum needs, a fact which GAO found to be contrary to the requirements of

CICA:

> As a general matter, we have held that the existence of procedures
> which are reasonably calculated to provide potential offerors with
> an opportunity to demonstrate that their products meet an
> agency's minimum needs at some stage of the planning process or
> of the procurement process itself is a necessary precondition to
> the valid imposition of solicitation restrictions which limit the
> extent of competition to the products of one manufacturer or a
> group of manufacturers.  (citation omitted).

*Id.* at 2; *see also Audio Intelligence Devices*, B-224159, Dec. 12, 1986, 86-2 CPD ¶ 670

(holding that sole-source award was improper where agency failed to adequately consider

whether protester's products will meet agency's minimum needs and the sole-source

justification failed to comply with procedural requirements under CICA to demonstrate the

rationale for agency's conclusion that only the proposed awardee can provide the required products).

In this case, DHS's Justification violates every precept of fairness embodied in CICA, FAR and decisions interpreting the statutory and regulatory framework governing agency acquisitions. Savantage has been serving DHS for many years with a financial management software system that fully meets DHS's minimum needs and, in fact, has performed better than other systems in use at DHS. Plaintiff's Appendix, Exhibit 1, ¶¶ 15 and 16. Yet, DHS has unfairly and improperly deprived Savantage of the opportunity through a competitive procurement to demonstrate from a technical and cost standpoint why its system should be selected for the DHS shared baseline. As demonstrated above, DHS's sole-source procurement utterly fails to comply with statutory and regulatory requirements. Additionally, as discussed below, the Justification does not comply with the procedural requirements dictated by CICA and the FAR.

C.    DHS Failed To Comply With Applicable Law
      With Respect To Its Brand Name Justification

Unbeknownst to Savantage when it filed this action, DHS executed the Justification on July 26, 2007 and explained its decision to standardize the financial management software systems used by agency components to the Oracle and SAP systems. AR, Tab 13, pp. 746-47. The Justification was accompanied and supported by the Business Case, dated April 25, 2007, AR, Tab 13, pp. 749-772, and the Alternatives Analysis, dated April 17, 2007. *Id.* at pp. 780-787. While other documents are included within Tab 13 in support of the Justification, it is the Justification, the Business Case, and the Alternatives Analysis that comprise DHS's substantive rationale for standardizing to the shared baseline system and for selecting the Oracle and SAP systems, to the exclusion of the Savantage system. DHS's conduct, which culminated in the issuance of the TASC solicitation for a support services contractor to

implement the migration to the Oracle system, was contrary to law and procedural requirements.

> 1.    Statutory And Regulatory Requirements Regarding
>        Sole-Source Awards And Brand Name Justifications

The Competition in Contracting Act, 41 U.S.C. § 253(a)(1), requires that "an executive agency in conducting a procurement for property or services . . . shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this title and the Federal Acquisition Regulation; . . .." The statute provides for the use of noncompetitive procedures under certain limited circumstances. 41 U.S.C. § 253(c)(1)-(7). Subsection (f) of the statute sets forth the requirements for a justification for use of noncompetitive procedures. FAR Subpart 6.3 implements the statutory requirements and "prescribes policies and procedures, and identifies the statutory authorities, for contracting without providing for full and open competition."

FAR 6.302-1, entitled "Only one responsible source and no other supplies or services will satisfy agency requirements," implements one of the exceptions to competition delineated at 41 U.S.C. § 253(c)(1). Subsection (c) of that FAR provision addresses brand name justifications and provides as follows:

> (c) *Application for brand name descriptions*. An acquisition that uses a brand name description or other purchase description to specify a particular brand name, product, or feature of a product, peculiar to one manufacturer does not provide for full and open competition regardless of the number of sources solicited. It shall be justified and approved in accordance with FAR 6.303 and 6.304. The justification should indicate that the use of such descriptions in the acquisition is essential to the Government's requirements, thereby precluding consideration of a product manufactured by another company. See FAR 5.102(a)(6) for the requirement to post the brand name justification. (Brand name or equal descriptions, and other purchase descriptions that permit prospective contractors to offer products other than those specifically referenced by brand name, provide for full and open

competition and do not require justification and approvals to
support their use.)

FAR 6.303-1 and 6.303-2 set forth the requirements related to, and the requisite contents of,

justifications for using other than competitive procedures.  As noted above, agencies must

comply with these provisions with respect to brand name justifications.  DHS did not fully

comply with FAR 6.303-2, as shall be discussed below.

As a preliminary matter, FAR 6.305, "Availability of the justification," states that "[t]he

justifications required by 6.303-1 and any related information shall be made available for public

inspection as required by 10 U.S.C. 2304(f)(4) and 41 U.S.C. 253(f)(4)," and further provides

that contractor proprietary data shall be removed from such justifications prior to public

disclosure.  DHS did not comply with this requirement.

2.    DHS's Brand Name Justification

DHS's Justification is prefaced with the statement that "this acquisition" (presumably

referring to the TASC solicitation) is conducted under the authority and requirements of FAR

16.505(b)(1) and FAR 11.105(a).  AR, Tab 13, p. 746.  FAR 16.505(b)(1) addresses the fair

opportunity requirements with respect to orders issued under multiple award contracts.[4]  FAR

11.105 provides that "agency requirements shall not be written so as to require a particular

brand-name, product, or a feature of a product, peculiar to one manufacturer" . . . unless--

(a)(1)  The particular brand name, product, or feature is essential
to the Government's requirements, and market research indicates
other companies' similar products, or products lacking that
particular feature, do not meet, or cannot be modified to meet,
the agency's needs;[5]

---

[4]  This FAR provision is cited because the TASC solicitation contemplates the award of a task order to a
support services contractor that has one of the multiple Functional Category 4 EAGLE contracts awarded
by DHS in 2006.  The support services contractor will be tasked with migrating the six DHS
components currently serviced by Savantage's FFMS system to the Oracle system.

[5]  As we shall demonstrate in the following section, Savantage's FFMS system does meet, and can be
further modified to meet, the agency's needs.  Thus, DHS has improperly invoked FAR 11.105(a)(1).

> (a)(2)(i)  The authority to contract without providing for full and
> open competition is supported by the required justifications and
> approvals (see 6.302-1); . . .

The Justification then purports to follow the content requirements of FAR 6.303-2; however, the document is missing many critical elements.

The Justification does not identify the estimated value of the supplies or services required to meet the agency's needs and does not identify the statutory authority permitting other than full and open competition.  FAR 6.303-2(a)(3) and (4); *see also* 41 U.S.C. § 253(f)(3)(B).  Nowhere in the documents contained within Tab 13 does DHS mention the costs of obtaining additional financial management software systems, expanded licensing of the existing Oracle system or maintenance for expanded use of the Oracle system.

The Justification does not include a "demonstration that the proposed contractor's unique qualifications . . . requires the use of the authority cited."  FAR 6.303-2(a)(5); *see also* 41 U.S.C. § 253(f)(3)(B).  While the Justification lists reasons why the Oracle and SAP systems provide DHS "███████████████████████," the identified reasons are not "unique" to Oracle or SAP because (with the exception of the ██ figure used in the first bullet) the reasons apply equally to Savantage's system, which supports 22% of the DHS budget.  AR, Tab 13, p. 747; *see also* Plaintiff's Exhibit 1 (Declaration of Michael Handberg), and its Attachment 3, in Plaintiff's Appendix in Support of its Motion for Preliminary Injunction and Application for Temporary Restraining Order ("Plaintiff's Appendix").

The Justification does not include "a description of efforts made to ensure that offers are solicited from as many potential sources as is practicable, including whether notice was or will be publicized as required by Subpart 5.2 and, if not, which exception under 5.202 applies."  FAR 6.303-2(a)(6); *see also* 41 U.S.C. § 253(f)(3)(E).  This is obviously because no such efforts were made and no such notice was publicized.  Savantage was never given the opportunity to

submit an offer to demonstrate that the Savantage system will best meet DHS's needs from both a technical and cost standpoint. And, Savantage was never given the opportunity to address and rebut the DHS rationale for selecting the Oracle and SAP systems as set forth in the Justification and accompanying Business Case and Alternatives Analysis.

The Justification does not include "a determination by the contracting officer that the anticipated cost to the Government will be fair and reasonable." FAR 6.303-2(a)(7); *see also* 41 U.S.C. § 253(f)(3)(C). In fact, while the Business Case accompanying the Justification provides █████████████████████████████████████████████████, nowhere does the Justification or the Business Case identify the anticipated cost to DHS of acquiring additional Oracle systems, licensing for expanded use of the Oracle system by other DHS components or maintenance costs for expanded use of the Oracle system, much less any determination that the anticipated cost will be fair and reasonable.

In addition, the Justification does not include "a description of the market research conducted (see Part 10) and the results or a statement of the reason market research was not conducted." FAR 6.303-2(a)(8); *see also* 41 U.S.C. § 253(f)(3)(D). The Business Case only addresses ████████████████████████████████████████ ███████████████████████████"). FAR 10.002, setting forth market research procedures, contemplates queries to and reviews from industry, acquisition personnel at other agencies, and customers in addition to obtaining agency internal information. Clearly, DHS conducted no market research and did not explain the reasons for not doing so.

Finally, DHS violated FAR 5.102(a)(6) by failing to include the Justification (even in redacted form) with the pending TASC solicitation (AR, Tab 4, pp. 78-185), or with the prior Solicitation No. HSHQDC-07-Q-00294 for the same support services (AR, Tabs 26, pp. 1118-1119, and 30, pp. 1143-1198), dated August 22, 2007, which was cancelled on October 4,

2007 (AR, Tab 18).  DHS also violated FAR 6.305 by failing to make the Justification and

related information available for public inspection.

DHS's failure to comply with these FAR requirements regarding the publication and

contents of the Justification, and accompanying Business Case and Alternatives Analysis, has

severely prejudiced Savantage, and perhaps other potential competitors, by depriving it of the

opportunity for the last six months to address and rebut DHS's rationale for selecting the

Oracle and SAP systems.

     D.     <u>DHS's Justification Was Arbitrary And Capricious</u>

Savantage does not take issue with DHS's determination to consolidate from the five

separate financial management software systems currently in use at the agency to a shared –

and eventually a single -- baseline system, and the rationale for that determination described in

the Justification and Business Case makes perfect sense.  Rather, it is DHS's decision, through

an improper non-competitive process, to select the Oracle and SAP systems that Savantage

disputes.  As demonstrated below, the reasons described in the Justification, Business Case,

and Alternatives Analysis for eliminating Savantage's FFMS system from consideration as one

of the two systems in the shared baseline are, to put it simply, inaccurate and wrong.

On pages 752 and 753 of the Justification (AR, Tab 13), DHS addressed some of the

reasons for selecting the Oracle and SAP systems:





The Justification then listed ▮ agencies using the Oracle system (▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮) and ▮ agencies using the SAP system (▮▮▮▮▮▮▮▮▮▮▮▮▮). AR, Tab 13, p. 754.

All of the reasons cited by DHS are equally applicable to the Savantage system. It is a standards-based software application that meets financial business requirements, is scalable, and proven within the DHS operating environment. *See* Exhibit 1, ¶ 11, to Plaintiff's Appendix; Second Handberg Declaration, ¶¶ 6-12. Moreover, the Savantage system is audit-compliant and has already been proven to provide clean audit opinions. In fact, audits have resulted in fewer findings, weaknesses and deficiencies at DHS components using the Savantage system than at components using the Oracle system. Exhibit 1, ¶ 15, and Exhibit 7

(DHS OIG 2007 audit finding Coast Guard and TSA, using Oracle systems, not in full

compliance with FFMIA) to Plaintiff's Appendix.

With respect to the assertion that Oracle and SAP already support ██████

██████, the chart at page 756 (Figure 1.1) of the Justification shows that, as of October 1, 2006,

███████████████████████████████████████████████████████████████

DHS.  Thus, it is equally true that ████████████████████████████

████████████████████████████.  The fact of the matter is that each of the

three systems ████████████████████████████████████████████████

███████████████ of DHS.

With respect to the second bullet point, DHS does not explain its assertion that the

Oracle and SAP systems "███████████████████████████████████████████

██████████" Nevertheless, Savantage's FFMS system is as ████████████████████

█████ if indeed not more so, than the Oracle and SAP systems.  While it is not entirely clear

what DHS meant with respect to "████████████" the term "██████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████"[6]  Savantage's system has not broken

down, has held up well under exceptional circumstances, and comes with a wide range of

capabilities.  In fact, after the establishment of DHS in 2003, DHS attempted to migrate

several components to the Oracle system, but the effort failed.  The same components were

then migrated to the Savantage system in a period of 30 days without problems.  Second

Handberg Declaration, ¶ 15.

---

[6]  These definitions were obtained from internet.com (Webopedia's Computer Dictionary).

In addition, the Savantage system has demonstrated its scalability, *i.e.*, ability to adapt to increased demands, through its migration from the former INS to the six DHS components currently using the system. Savantage has been extremely flexible over the years through timely deliveries of customer-specific enhancements to core software and of necessary system updates. Finally, Savantage's system is just as "█████████" as the Oracle and SAP systems. The FFMS currently interfaces with the Bonds Management System, the Intra-Governmental Payment and Collection (IPAC) system, the Treasury payment file transmission and confirmation system, the NFC payroll system, and the GELCO Travel Manager system. Although DHS has never tasked Savantage to develop an interface with the Asset Management (Sunflower) system, Savantage expended its own funds in 2005 to build and demonstrate to DHS a prototype interface with Sunflower, and that prototype interface remains available today should DHS choose to acquire it. Second Handberg Declaration, ¶ 17. In addition, DHS tasked Savantage in 2004 to develop an interface with the Procurement System application (PRISM), and Savantage completed that task in June 2006. However, DHS has delayed deployment of that interface for reasons discussed later in this section.

The third, fourth and fifth bullets noted above do not demonstrate any superiority of the Oracle and SAP systems to the Savantage system. While the Oracle system supports four DHS components and the SAP system supports one component, the Savantage system currently supports six components. Savantage agrees that consolidation is not as costly as building an entirely new system, and contends that consolidation to the Savantage system will result in substantial cost savings to DHS because (unlike the licensing arrangement with Oracle) DHS already has an agency-wide license with Savantage. Furthermore, as previously stated, previous audit results establish that using the Savantage system, either exclusively or in a shared baseline with Oracle or SAP, will reduce DHS exposure to adverse audit findings

because historically the components using the FFMS system have had fewer audit findings, deficiencies and material weaknesses than those using the Oracle and SAP systems.

DHS has also stated that Oracle and SAP are ███████████, citing implementations at ██ agencies for Oracle (███████████████████) and ██ agencies for SAP. A similar list could be compiled with respect to FFMS implementations by Federal agencies. The list of 12 agencies includes the six DHS components using the Savantage system, the U.S. Department of Labor, the U.S. Department of the Treasury, Federal Retirement Thrift Investment Board, the U.S. Department of Defense, the Architect of the Capitol, and the U.S. House of Representatives. Exhibit 1, ¶ 10, to Plaintiff's Appendix. Additionally, Savantage's FFMS system has competed against the Oracle and other "leading" financial management systems in recent Federal procurements. With respect to three of the five identified procurements, the FFMS system was selected for award in favor of the Oracle system. Second Handberg Declaration, ¶ 14.

On page 754 of the Justification, DHS █████████████████████████ ██████████████████████████." The Savantage FFMS system ████████████████████: (1) as demonstrated by previous audits, the system will enhance DHS's ability to achieve unqualified audits, and it will support robust reporting requirements and enable the Secretary's Priority 12.2 to unify IT infrastructures; (2) the FFMS is FISO-compliant and has demonstrated it can support a clean audit opinion; (3) the FFMS already supports the PMA framework and uses an OMB-compliant accounting line; (4) the FFMS is already constructed on a Service Oriented Architecture, and is a suite of real-time integrated applications ensuring users have the most accurate and timely data to support operations; (5) the FFMS already provides an approved Chart of Accounts compliant with the USSGL and OMB Circular A-127 requirements; (6) the FFMS already

provides compliance with FISCAM, NIST and other applicable federal requirements, including

NIST security requirements; and (7) FMLoB compliance will be achieved using the FFMS,

singularly or in a shared baseline approach, for the same reasons listed on page 754 (7th bullet

point). *See* Exhibit 1, ¶¶ 3, 9, 11, 15, and Attachments 1 and 3, to Plaintiff's Appendix;

Second Handberg Declaration, ¶¶ 6-12..[7]

On page 756 of the Justification, DHS estimated that "

." DHS then listed several areas in which standardizing to the Oracle and SAP

systems will allow DHS "                                    ." The six listed

, however, are directly associated with the consolidation

from five systems to two and do not differentiate between any

Savantage system.  Indeed, the same

would result from a migration to the

Savantage system, either as a single baseline or in a shared baseline.  Most importantly,

the substantial cost associated with the expansion of DHS's

licensing arrangement with Oracle, which Savantage estimates will be between $26M and

$75.5M over the next ten years, or that additional licensing costs would not be incurred

through migration to the Savantage system.  Exhibit 1, ¶¶ 4-6 and 17, to Plaintiff's Appendix;

---

[7] One need only review the requirements of the Financial Systems Integration Office for certification as an FSIO-compliant software product to recognize that the Savantage FFMS system (now called Altimate) would not be FSIO certified (Exhibit 1, Attachment 1, to Plaintiff's Appendix) unless it met all of the technical system and functional requirements set forth in the Office of Federal Financial Management's publication "Core Financial Systems Requirements" (OFFM-NO-0106), January 2006.  This publication can be found at www.fsio.gov under the heading "systems requirements documents."

Second Handberg Declaration, ¶ 9, and Attachment 1 thereto (chart comparing the 10-year life cycle costs of staying with ICE's current system (FFMS) to replacing it with TSA's system (Oracle)).

The Justification provided a brief description of the five financial management systems in use at DHS at page 759.  With respect to the Savantage, Oracle and SAP systems, the Justification stated as follows:



The first striking aspect of these brief descriptions is that the ███████████████. Like Oracle and SAP, however, the FFMS is a COTS product.  The ████████████ ████████████ the Independent Auditor's Report on DHS' FY 2007 Balance Sheet and Statement of Custodial Activity (Exhibit 7 to Plaintiff's Appendix) found numerous significant deficiencies and material weaknesses with the accounting at the Coast Guard and TSA, which use the Oracle system, but far fewer problems at ICE, which uses the Savantage system.

███████████████████████

████████████████████████████████. As stated above, DHS

has never tasked Savantage to develop an interface with the Sunflower application, but

Savantage expended its own funds to develop that interface, which is ready for deployment

should DHS wish to acquire it.  Second Handberg Declaration, ¶ 17.  Moreover, in November

2004, the ICE Office of Procurement requested Savantage to develop an automated interface

between FFMS and PRISM.  Savantage began work on the interface requirements document in

February 2005 and, following an ICE delay in obtaining funding, the work resumed in August

2005 with a target implementation in December 2005.  The interface integration testing

occurred in early February 2006, and ICE acceptance testing was scheduled in late March with

an implementation date in June 2006.  Savantage completed its work on the interface in June

2006.  In late June, DHS security stopped the interface implementation due to a concern about

the security of the data being passed between DHS users and the PRISM application.  No

further work has been done on the interface since that time notwithstanding Savantage's urging

on several occasions to implement the interface since all development and testing had been

accomplished, ICE had paid for the effort, and Savantage was ready to deploy the interface.

The security concerns surrounding this deployment related to the PRISM application

and not to the FFMS system.  It is Savantage's understanding that, to resolve the security

concerns, DHS decided to re-host the PRISM application in a DHS-controlled data center

rather than the vendor-provided data center where the application resided, and that the target

date for completing the re-hosting would be June 2007.  Second Handberg Declaration, ¶ 18.

Of course, by that time, DHS was in the process of making the decision to select the Oracle

and SAP systems for the shared baseline, and it is assumed that DHS consequently determined

that implementation of the FFMS/PRISM interface was unnecessary.  The facts demonstrate

that Savantage did everything it was tasked to do in order to implement the interface, but it

was DHS that ███████████████████ in that regard.

Section 5.1.4, entitled "█████████," on page 763 of the Justification noted that the

TSA and CBP Shared Baselines "███████████████████████████████

████████████████████████████████████

█████████████." It was further stated that the Baselines offer ██████████████

███████████████████ The exact same

characteristics apply to the Savantage FFMS system. *See* fn. 7 above.

In the Alternatives Analysis portion of the Justification, DHS stated that "█████████

███████████████████████████████████

█████████████████████████████████."

AR, Tab 13, p. 783.  These overly-general comments ██████████████████████

████████████████████████████████████

████████████████ With respect to the "████████████"

listed on page 784, the listed criteria are equally applicable to the FFMS system except as

previously discussed herein and in Plaintiff's previous submissions to the Court.

Finally, in Table 2 on page 786 of the Alternatives Analysis, DHS listed eight

"█████████" and indicated the extent to which the five existing systems meet the

requirements.  The chart indicates that the FFMS system meets ████████████

█████████; however, the chart is patently incorrect.  These "█████████" raise the same

issues ████████████████████.  The FFMS system meets all ███ of

the listed considerations/requirements.  Second Handberg Declaration, ¶¶ 6-12.

In sum, nearly all – if not all – of the characteristics identified in the Justification as

warranting the selection of the Oracle and SAP systems apply equally to the Savantage system.

It is readily apparent that, notwithstanding the overall superior performance of the FFMS system, DHS has selected the Oracle and SAP systems because they are the products of very large companies and due to DHS's misguided belief that a small company, such as Savantage, poses greater risks of future failure leaving DHS without developer support for its financial management system. This bias in favor of large companies is not only unwarranted (and indeed Savantage has won major procurements over Oracle and other large competitors), it is also contrary to statutory and regulatory requirements and goals for contracting with small business concerns. Savantage, a woman-owned small business founded in 1982, has faithfully and successfully serviced all of its customers, including those in the government sector since entering the Federal market in 1994. Savantage has continued to grow over the years and has received numerous accolades and awards for its expertise and capabilities. Exhibit 1, ¶ 10, to Plaintiff's Appendix; *see also* www.savantage.net. There is simply no basis for DHS's speculation that Savantage may disappear someday and leave DHS in the lurch with a system that cannot be kept current, upgraded, and maintained.

Accordingly, the Justification executed by DHS contained material factual misstatements and omissions skewed in a manner to lead a reader to believe that the Oracle and SAP systems are superior to the Savantage system. As such, the Justification was clearly arbitrary and capricious.

## IV.   CONCLUSION

The administrative record in this case reflects a fatally flawed process by which DHS has sought to consolidate its financial management software system. There exists no valid justification for the agency's failure to conduct a competitive procurement to select a single system among those currently in use at DHS, and DHS's attempts at such a justification were arbitrary and capricious, an abuse of discretion, and clearly contrary to applicable law.

Moreover, Plaintiff has demonstrated that it has been severely prejudiced by DHS's improper actions. For these reasons, Plaintiff respectfully requests that the Court grant its requests for injunctive and declaratory relief.

Respectfully submitted,


_____s/ Timothy Sullivan_____

Timothy Sullivan
1909 K Street, N.W., 6th Floor
Washington, D.C.  20006
(202) 585-6930 (tel.)
(202) 508-1028 (fax)

Attorney of Record for Plaintiff Savantage
Financial Services, Inc.

Of Counsel:

Katherine S. Nucci
Thompson Coburn LLP
1909 K Street, N.W., 6th Floor
Washington, D.C.  20006
(202) 585-6900 (tel.)
(202) 585-6969 (fax)

Dated:  February 8, 2008

CERTIFICATE OF FILING

I hereby certify that on the 8th day of February 2008, a copy of "Plaintiff's Motion For Summary Judgment On The Administrative Record" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.


_____ s/ Timothy Sullivan _____

EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
Bid Protest

| | | |
|---|---|---|
| Savantage Financial Services, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:08-cv-21 |
| | ) | (Judge Futey) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## SECOND DECLARATION OF MICHAEL HANDBERG

I, Michael Handberg, make the following Declaration pursuant to 28 U.S.C § 1746:

1.     I am presently employed by Savantage Financial Services, Inc. I am an Executive Vice President. I started my employment in January 2006.

2.     I am very familiar with the Savantage financial systems software application called "Federal Financial Management System ("FFMS")," which is currently used by the following six components of the U.S. Department of Homeland Security ("DHS"): Immigration and Customs Enforcement ("ICE"), U.S. Citizenship and Immigration Services ("USCIS"), National Protection and Programs Directorate ("NPPD"), Science & Technology Directorate ("S&T"), Office of Health Affairs ("OHA") and Office of the Secretary & Under Secretary for Management ("DHS HQ"). Savantage has a contract with ICE, under which the other five DHS agencies listed above use the Savantage software.

3.     In 2004, Savantage's FFMS solution was renamed "Altimate" for marketing reasons, i.e., to avoid confusion with competing products in the market place, some of which had similar names. However, it is the same solution referenced in the TASC RFQ as "FFMS." For the purposes of this declaration, I will refer to the Savantage Altimate solution as the FFMS system following the usage in the RFQ. Specifically, FFMS, under

the name Altimate, is an FSIO-certified financial management system software solution.
*See* Exhibit 1, Attachment 1, to Plaintiff's Appendix.

4.    I have reviewed the seven specific "objectives" that the TASC procurement
is intended to meet by "migrating" the Oracle Federal Financials Core Accounting Systems
to the DHS agencies currently served by Savantage's FFMS. These seven specific
"objectives" are listed on pages 10 and 11 of the RFQ (Section C.1). AR, Tab 4.

5.    I will explain below how Savantage's FFMS already meets all of the RFQ's
seven specific objectives for TASC. After quoting each "TASC objective," my comments
are provided about that "objective."

6.    **"Eliminates reporting errors via removal of manual processes and
controls"**: The Savantage FFMS software already meets this objective. DHS appears to be
concerned about the data errors that can occur when data entries have to be made or
checked manually because of human error. By automating these controls, users eliminate
reporting errors because new data entry (and the possibility of errors) is eliminated. FFMS
already provides a full set of automated processes that are programmed as part of the
workflow system.

7.    **"Generates real-time interoperability within a Service Oriented
Architecture (SOA) across the financial management enterprise to improve
operations"**: The ICE software (FFMS) already incorporates an SOA architecture. The
SOA architecture allows "business processes" to be exposed and called on by other
applications across DHS. Savantage's FFMS software is built on the Oracle development
platform; as a result, the SOA interoperability capability is the same as TSA's system
because the two systems use the same Oracle Platform. Further, the Savantage solution is
designed and implemented so that the General Ledger (the place that records all
transactions) and is updated "real-time." By contrast, the Oracle TSA application updates
the General Ledger as a "Batch" process that has to be scheduled. Therefore, the General
Ledger in Savantage's software is more "real-time" than TSA's Oracle General Ledger.

8.    **"Provides a foundation for effective internal controls, standardized
business processes, and data standardization to move DHS closer to a sustainable
unqualified audit opinion"**: The Savantage FFMS software development lifecycle, from
requirements through delivery to ICE, has been audited by KPMG, the DHS independent

audit firm, as part of the Department's overall audit process. The audit steps performed are part of a Federal Information System Controls Audit Manual (FISCAM) audit. In 2005 and 2006, ICE was the agency with the lowest number of FISCAM audit findings within the entire Department by a wide margin, compared to other agencies with operational financial systems (such as Coast Guard and FEMA). Further, there have never been any FISCAM findings to date related to the software lifecycle process supporting FFMS upgrades to ICE. Additionally, the standardization of business processes is achieved by requiring agencies to use FSIO-approved software. The reason the Government requires this approval is to ensure that government agencies have standardized software and data. Since both Savantage's FFMS and the Oracle system used at TSA are compliant with FSIO standardized processes, the TASC migration will simply move from one set of standard core processes and data to another core set of standard processes and data.

9.    **"Reduces maintenance costs"**: Less than five years ago, ICE fully implemented its software and is now in its Operational & Maintenance (O&M) stage. Over 13,000 users across DHS have been trained on the system and the Government is not charged any fees based on user headcount (unlike the Oracle applications used by TSA). The calculation in Attachment 1 hereto shows DHS's planned migration will not lower maintenance costs; rather, the migration will increase such costs by over $159 million over the next 10 years.

10.    **"Reduces outdated, highly customized software"**: The FFMS is a real-time integrated Oracle solution, which can be maintained by many vendors with knowledge of Oracle-based solutions. Because of the particular license agreement that was negotiated with INS (subsequently ICE), Savantage (rather than another vendor) has regularly maintained the FFMS software supporting DHS's ICE and its customer agencies. Since the implementation in 1997 of its system, Savantage has regularly delivered releases as well as updates to the software. These deliveries include both customer-specific enhancements to core software, and upgrades to stay current with technology advancements and changing government regulations and system requirements. Savantage's FFMS software was developed using the latest Oracle technology and is FSIO-certified. It is a modern COTS package, which has been adopted by a number of federal agencies. FFMS is <u>not</u> an out-of-date, highly customized software solution.

11.     **"Provides an approved Chart of Accounts compliant with the United States Standard General Ledger (USSGL) and Office of Management and Budget (OMB) Circular A-127"**: The ICE software already provides an approved Chart of Accounts compliant with the USSGL and OMB Circular A-127 requirements. The software would not be FSIO-certified if it did not comply with this requirement.

12.     **"Supports the President's Management Agenda (PMA) framework and uses an OMB-compliant accounting line"**: The ICE software already supports the PMA framework and uses an OMB compliant accounting line. For example, the President's Management Agenda asks agencies to achieve a clean audit opinion. The last DHS Inspector General Report from 2007 shows that TSA Oracle software has been significantly behind the FFMS software in achieving compliance with fixing internal controls and with the requirements of the President's Management Agenda. See Exhibit 7, p. i.2 (chart entitled "Summarized DHS FY 2007 Internal Control Findings"), to Plaintiff's Appendix. In my opinion, the TASC initiative seems to be a giant step backwards from achieving the stated objective of supporting the PMA.

13.     In my experience, federal agencies with a requirement for a single financial management software application have selected that application by using a full and open competitive process. There are a number of examples of such competitions, including the following:

> **U.S. Army:** When the US Army decided to standardize on a single financial management system, it ran the GFEBS procurement. In that procurement, valued at $500+ million, the Army asked vendors to team with software providers and propose a solution to the Army's requirements. (RFP No. W91QUZ05R0005)

> **U.S. Air Force:** When the U.S. Air Force decided to standardize on a single financial management system, it ran the two-part DEAMS procurement. The first phase was the selection of the software package, and the second phase was the selection of the integrator to implement the software. (RFP Nos. FA877004R0062 and FA877004R0029)

> **Department of Labor:** When the Department of Labor decided to standardize on a single financial management system, it released an RFP asking integrators to team with software providers and propose a solution to their requirements. (BPA No. 03-016 off IBM's GSA schedule GS23F7107H)

> **Department of Agriculture:** When the Department of Agriculture decided to standardize on a single financial management system, it released an RFP asking

integrators to team with software providers and propose a solution to their requirements. (RFP No. AG3142S06001l)

**Department of Justice:** When the Department of Justice decided to standardize on a single financial management system, it ran the Unified Financial Management System (UFMS) procurement. It was a two-step process. The first step was to select the COTS software, and the second step was to select the best integrator to implement the COTS software. (RFP No. DJJo6-F-1338)

14.    Savantage's software is a viable and competitive COTS product in the commercial and federal marketplace. It has won numerous head-to-head competitions against leading well-known products including Oracle and PeopleSoft. Over the past five years, Savantage has a successful track record of competing and winning in the federal marketplace. In full and open competitions at three federal agencies in the last five years, Savantage was evaluated to be superior to Oracle. Savantage's contract awards include:

❖    Savantage's software competed against Oracle and PeopleSoft for the Millpay project and won. Milpay is a program of the Defense Department's Defense Finance and Accounting Service.

❖    Savantage's software competed against Oracle and Hyperion for the U.S. Department of the Treasury GFRS project and won. GFRS is the Government-wide Financial Reporting System. The GFRS is the system developed by the Department of Treasury's Financial Management Service to capture each agency's Closing Package information. GFRS is an internet application designed to directly link data from agencies' financial statements to the corresponding line items in the Financial Report of the United States Government.

❖    Savantage's software competed against AMS and ACS for the Thrift Savings Plan (TSP) project and won. TSP is a retirement savings plan for civilians who are employed by the United States Government and for members of the uniformed services, administered by the Federal Retirement Thrift Investment Board.

❖    Savantage's software competed against Oracle and AMS for the Maritime Commission Financial Management project and won. The Federal Maritime Commission is an independent federal regulatory agency responsible for the regulation of ocean-borne transportation in the foreign commerce of the U.S.

❖    Savantage's software competed against AMS and CDSI for the original INS contract (the predecessor contract to the current ICE contract) and won.

15.    In 2003, in addition to existing organizations that joined the newly-formed DHS (*e.g.*, INS, Coast Guard, FEMA), DHS created new organizations like Science & Technologies, Information Analysis and Infrastructure Protection, Office of the Secretary,

*etc.* When these new organizations were created, the Coast Guard, using its Oracle Federal Financials system, paid their bills and did their accounting. After one year, the DHS Office of the Chief Financial Officer (OFCO) decided that the Coast Guard system was not paying these new offices' bills in a timely fashion and that the data the Coast Guard system provided was not detailed enough for these offices to track and monitor the transactions against their budgets. Consequently, in 2004, the DHS OCFO instructed the ICE CFO to take the data for these organizations from the Coast Guard and put it on the ICE FFMS system. The ICE CFO complied and, since ICE already owned an agency-wide license for FFMS, FFMS was set up for these organizations and ICE started paying their bills and doing their accounting. This effort was accomplished within 30 days and without any additional contractor implementation dollars.

16. DHS's position seems to be that Savantage's FFMS product can't meet the needs of DHS because Savantage is a small company and its product has not been deployed as extensively at federal agencies as have the Oracle and SAP products. This position, however, applies equally to a critical part of the TASC Oracle Baseline identified on page 11 of the RFQ, *i.e.*, the GCE Finance and Procurement Desktop (FPD) developed and supported by Global Computer Enterprises, Inc. ("GCE"). GCE is a small business with approximately 100 employees, which is about two-thirds the size of Savantage. FPD is a proprietary software solution developed using the same technology base as Savantage's FFMS product, the Oracle development tool set. The FPD is only being used at DHS (and according to the GCE website, only at the Coast Guard), while Savantage's software is being used at DHS, Commerce, Treasury, TSP, and other federal agencies. It would appear that the FPD is a far riskier solution given the small number of deployments compared with Savantage's software, yet Savantage's "small number of deployments" was apparently used as a reason to eliminate it from the TASC solution.

17. The FFMS currently interfaces with the NFC payroll system, Bonds Management system (BMIS), Intra-governmental Payment and Collection (IPAC) system, and Treasury payment file transmission and confirmation system. The DHS agencies served by Savantage's FFMS do not use the e-Travel application (also referred to as E-Gov Travel Service); rather, they use a product called Gelco for travel administration. FFMS has a fully operational interface with Gelco in place with the components using FFMS.

Savantage was tasked by the Resource Management Transformation Office (RMTO), the organization running the TASC initiative, to develop an interface with e-Travel, and this interface has been developed, accepted and paid for. The interface has not been implemented, however, because e-Travel itself has not been implemented due to technical problems. These technical problems have nothing to do with Savantage's interface. Savantage has never been tasked to develop an interface with Sunflower, an asset management application. Sunflower, a relatively simple application as compared to others, is a solution for managing fixed assets which was acquired by DHS for agency-wide use sometime in 2005 or 2006. Sunflower is a proprietary COTS product of a small business, and it primarily provides data storage with some simple computations for depreciation. In 2005, Savantage used its own funds to build and demonstrate to DHS a prototype interface with Sunflower. This prototype interface remains available should DHS choose to acquire it.

18.     In November 2004, the ICE Office of Procurement requested Savantage to develop an automated interface between FFMS and PRISM, a procurement system application. Savantage began work on the interface requirements document in February 2005 and, following an ICE delay in obtaining funding, the work resumed in August 2005 with a target implementation in December 2005. The interface integration testing occurred in early February 2006, and ICE acceptance testing was scheduled in late March with an implementation date in June 2006. Savantage completed its work on the interface in June 2006. In late June, DHS security stopped the interface implementation due to a concern about the security of the data being passed between DHS users and the PRISM application. No further work has been done on the interface since that time notwithstanding Savantage's urging on several occasions to implement the interface since all development and testing had been accomplished, ICE had paid for the effort, and Savantage was ready to deploy the interface. The security concerns surrounding this deployment related to the PRISM application and not to the FFMS system. It is Savantage's understanding that, to resolve the security concerns, DHS decided to re-host the PRISM application in a DHS-controlled data center rather than the vendor-provided data center where the application resided, and that the target date for completing the re-hosting would be June 2007. On numerous occasions in 2006 and 2007, Savantage communicated with, and made presentations to, ICE officials urging the implementation

of the PRISM interface. A thorough description of this effort is described in a June 5, 2007 white paper presented to ICE, attached hereto as Attachment 2. To reiterate, there are no security concerns with the FFMS system; rather, the concerns are with the PRISM application itself.

19.     On information received from reliable sources, I learned that in March or April 2007, ICE purchased six 10g licenses from Oracle to use as part of the TASC initiative. It is my understanding that the purchase price was in the neighborhood of $500,000.00. This information is consistent with my previous declaration in which I stated that DHS will have to purchase additional licenses from Oracle at substantial expense in order to implement the TASC initiative. In other words, if DHS had an agency-wide license with Oracle (as it does with Savantage), DHS would not have had to purchase the additional licenses from Oracle last spring.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 8, 2008.

Michael Handberg

ATTACHMENT 1

**Comparison of the 10-Year Life Cycle Costs with Staying with ICE's Current System or Replacing with TSA's System**

**Current 10-year ICE System Costs**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| License (1) | $ 75,000 | $ 75,000 | $ 75,000 | $ 75,000 | $ 75,000 | $ 75,000 | $ 75,000 | $ 75,000 | $ 75,000 | $ 75,000 | $ 750,000 |
| Support (2) | $ 10,925,000 | $10,925,000 | $10,925,000 | $10,925,000 | $10,925,000 | $10,925,000 | $10,925,000 | $10,925,000 | $10,925,000 | $10,925,000 | $ 109,250,000 |
| Total | $ 11,000,000 | $11,000,000 | $11,000,000 | $11,000,000 | $11,000,000 | $11,000,000 | $11,000,000 | $11,000,000 | $11,000,000 | $11,000,000 | $ 110,000,000 |

**10-Year Costs to Replace ICE's software with TSA software under the TASC RFP**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| License (3) | $ 26,000,000 | $ 5,500,000 | $ 5,500,000 | $ 5,500,000 | $ 5,500,000 | $ 5,500,000 | $ 5,500,000 | $ 5,500,000 | $ 5,500,000 | $ 5,500,000 | $ 75,500,000 |
| Support (4) | $ 2,500,000 | $ 5,000,000 | $ 7,500,000 | $10,925,000 | $10,925,000 | $10,925,000 | $10,925,000 | $10,925,000 | $10,925,000 | $10,925,000 | $ 91,475,000 |
| Dual Systems (5) | $ 11,000,000 | $11,000,000 | $11,000,000 | | | | | | | | $ 33,000,000 |
| Migration (5) | $ 20,000,000 | $25,000,000 | $25,000,000 | | | | | | | | $ 70,000,000 |
| Total | $ 59,500,000 | $46,500,000 | $49,000,000 | $16,425,000 | $16,425,000 | $16,425,000 | $16,425,000 | $16,425,000 | $16,425,000 | $16,425,000 | $ 269,975,000 |

**ICE's Cost Advantage Over TSA by Year**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | $ 48,500,000 | $35,500,000 | $38,000,000 | $ 5,425,000 | $ 5,425,000 | $ 5,425,000 | $ 5,425,000 | $ 5,425,000 | $ 5,425,000 | $ 5,425,000 | $ 159,975,000 |

**Estimating Notes**
(1) The current license fee paid by DHS for the ICE Software to support 13,000 users
(2) The current cost of support for the ICE software
(3) The cost to purchase 13,000 user licenses for Oracle Federal Financial and outyear maintenance.  The cost is based on the published GSA Schedule price
(4) The cost to support TSA at the same level as ICE.  However, acuatl costs will most likey be 40% higher due to the demand for staff with Oracle experience.
(5) The cost of keeping ICE's current software running while it is replaced by TSA
(6) The cost of establishing the baseline and migrating the 7 DHS components to TSA.  The costs are based on similar implementations and the hours in the price model of the TASC RFP

ATTACHMENT 2

# Savantage Solutions
# White Paper

**TRANSFORMING CLIENTS' VISION INTO RESULTS**

Savantage Solutions
1355 Piccard Drive, Suite 425
Rockville, MD 20850

# The FFMS/PRISM
# Automated Interface

*June 5, 2007*



*This document and its contents are copyrighted and protected by trade secrets of Savantage and may not be used for any purpose without the advanced written authorization of Savantage.*

## The FFMS/PRISM Automated Interface

### I.   Background

The integration of Compusearch's PRISM product, DHS' procurement solution, and FFMS, the financial management system used by Immigration and Customs Enforcement (ICE) and its customer agencies, is critical to improving the financial management challenges at ICE. This integration effort for ICE has been strongly recommended by auditors as well as independent bodies such as the National Academy of Public Administration (NAPA), because of its potential to eliminate current financial management challenges.

The ICE Offices of the Chief Financial Officer, Chief Information Officer, and Acquisition Management authorized and initiated development of an automated interface between the Savantage Federal Financial Management System (FFMS) and PRISM in November 2004, and as of June 2006, the interface has been completed, tested and is production ready

Although deployment of this interface would be a major success in a short time, a series of issues related to data security issue over the PRISM application have continued to delay the deployment of this interface for more than a year. Since DHS has continued to use the PRISM application despite this security concern, it is only logical to go forward with the deployment of the PRISM/FFMS interface to automate the related manual processes as soon as possible, so that DHS can benefit from the investments already made.

### II.   Why the PRISM/FFMS Interface is Critical to ICE and the Components

The PRISM/FFMS interface would bring significant value to both ICE and the component agencies currently supported by ICE. FFMS tracks all budgetary, financial, and accounting operations for over $9 billion of DHS's budget every year. Some 21,000 requisitions and over 56,000 obligation documents were created in FFMS in fiscal year 2006 by ICE and the component agencies. Therefore by eliminating duplicate data entry of ICE requisitions and purchase orders in two applications, PRISM and FFMS, DHS will benefit from:

1.  Increased efficiencies, because resources can be focused on analytical decision-support activities, rather than tedious data entry functions.

2.  Access to more reliable information, since the automated interface will eliminate data issues caused by data entry errors.

3.  Access to more timely data, since the interface is designed to update new transactions recorded in PRISM to FFMS in near real-time.

4.  Improved business processes and internal controls related to managing open obligations and coordination of the accounting and procurement data for DHS purchasing activity.

5.  Ability to leverage an interface effort between two critical business applications using the tenets of Service Oriented Architecture (SOA), so that future business and technology demands and changes can be easily incorporated into the interface technical architecture.

The importance of having this interface operational as soon as possible, which is a critical business and financial management issue for ICE and the components, has been reiterated many times over the years. On November 14, 2005, KPMG LLP issued its audit report of DHS's consolidated balance sheets for the fiscal years ending September 30, 2004 and 2005.

The audit report identified a number of findings related to obligation processing for ICE. Specifically:

- For finding ICE-05-02 (Amended), *Lack of Obligations recorded in FFMS*, the auditors recommended implementation of an automated interface between PRISM and FFMS. DHS management concurred with the auditors Notification of Finding and Recommendation.

- For finding ICE-05-12, *Verification and Validation procedures for Undelivered Orders*, the DHS management response states: "PRISM will be interfaced with FFMS; thus, eliminating the need to reconcile PRISM's data with the information in FFMS."

- For finding ICE-05-47, *Obligations are not being recorded in FFMS in a timely manner*, the auditors recommended implementation of an automated interface between PRISM and FFMS. DHS management concurred with the auditors Notification of Finding and Recommendation.

The DHS FY2006 Performance and Accountability Report (PAR), Section III Financial Management, contains these same findings.

In October 2006, the National Academy of Public Administration (NAPA) published a report entitled "Stabilizing and Enhancing Financial Management – *An Independent Review of the ICE Financial Action Plan* – July-August 2006." In four sets of Observations and Opportunities and Recommendations, in the Financial Action Plan areas of Budgeting Accounting, Unliquidated Obligations, Intragovernmental Balances, and Financial Systems, the report states that DHS should complete implementation of the FFMS/PRISM interface in order to effectively manage open obligations and to synchronize purchasing data between the procurement and the financial management organizations (See pages 13, 15, 16, and 17).

## III.   Current Status of the PRISM/FFMS Integration Effort

As indicated earlier, the interface is ready for deployment, but has been delayed for over a year. Savantage received the initial request for development of an automated interface between FFMS and PRISM from the DHS ICE Office of Procurement in November of 2004. Work on the interface requirements document began in February 2005. Following an ICE delay in obtaining funding, work resumed in August 2005 with a target implementation in December 2005. Resolution of several data issues delayed interface integration testing until early February 2006, with ICE acceptance testing scheduled in late March and an implementation date in June 2006. In late June, DHS security stopped the interface implementation due to a concern about the security of the data being passed between DHS users and the PRISM application. No further work has been completed for the interface since that time.

The reason for the current delay in restarting the FFMS/PRISM interface implementation process appears to be a DHS decision to re-host the PRISM application in a DHS-controlled data center to address the data security concern. PRISM is currently hosted in a vendor-provided data center. The target date for completing the re-hosting is reported to be June of 2007. However, despite this security concern over PRISM data, DHS has continued usage of the PRISM application for its procurement activities rather than suspending it. Hence it is unclear why this security issue has hindered deployment of the interface, but not the application itself.

## IV.    Recommendation

DHS should immediately proceed with implementation of the FFMS/PRISM interface as recommended by both the KPMG auditors and the NAPA report, and as agreed to by DHS ICE CFO Management in the ICE Financial Action Plan published in February 2006. Implementation of the interface will address critical internal control and obligation business process issues for ICE and its customers.

The completed interface makes use of secure SOA methods (SOAP XML messages transported via an encrypted Secure Socket Layer (SSL)) for data communication between the two systems. The interface will be hosted in the secure DOC data center which currently hosts FFMS. Finalization of the interface implementation should not be delayed any further: DHS users continue to use PRISM today, so clearly DHS has determined that the security risk is manageable. The FFMS/PRISM interface was developed using a secure connection between the two applications and poses no additional security risk for the agency. The financial management benefits of the interface as identified by the auditors and the NAPA team justify completion of the implementation effort.

## V.    Interface Overview

The FFMS/PRISM interface is designed for Requisitions that originate in FFMS to be passed automatically to PRISM as XML messages over a secure network connection. Purchase Orders created in PRISM are linked to Requisitions at the item and accounting information level and automatically passed to FFMS via the same secure connection. When the contract award occurs, the funds held for commitment in FFMS are processed as purchase orders in PRISM and the obligation is created. If items are not linked to Requisitions, a funds check is automatically performed. Any requisitions with insufficient funds are rejected. Requisition and Purchase Order Change Orders are processed in the same manner.

Transactions that do not process successfully on either side of the interface are documented in detailed interface log reports and entered manually once the cause of the error is identified and corrected.

The diagrams included as Attachments A and B provide overviews of the Interface Process Flow and Interface Architecture respectively.



FFMS/PRISM Interface Process Flow Diagram

Interface Architecture Diagram

